# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
─────────────────────────────── x
                                 :
In re:                           :
                                 :
LATEX FOAM INTERNATIONAL,        :    Chapter 11
LLC, et al.,                     :
                                 :    Lead Case No. 19-51064 (JAM)
            Debtors.             :
─────────────────────────────── x
                                 :
OFFICIAL COMMITTEE OF            :
UNSECURED CREDITORS OF           :
LATEX FOAM INTERNATIONAL         :
LLC, et al.,                     :    Case No. 3:20-cv-01200 (VLB)
                                 :
            Plaintiff-Appellant, :
                                 :
v.                               :
                                 :
ENTREPRENEUR GROWTH              :
CAPITAL, LLC                     :
                                 :
            Defendant-Appellee.  :
─────────────────────────────── x
```

## APPELLANT'S BRIEF IN SUPPORT OF APPEAL FROM BANKRUPTCY COURT ORDER AWARDING INTEREST AT THE DEFAULT RATE

| **PULLMAN & COMLEY, LLC** | **LOWENSTEIN SANDLER LLP** |
|---|---|
| Irve J. Goldman, Esq. (CT Bar No. 02404)  850 Main Street, 8th Floor P.O. Box 7006 Bridgeport, CT 06601 (203) 330-2213 E-mail: jgoldman@pullman.com | Wojciech F. Jung, Esq. 1251 Avenue of the Americas New York, NY 10020 (212) 262-6700 E-mail: wjung@lowenstein.com |

*Counsel to Appellant The Official Committee of Unsecured Creditors*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... ii

APPELLANT'S BRIEF ................................................................................1

STATEMENT OF THE BASIS
OF APPELLATE JURISDICTION ...............................................................1

STATEMENT OF ISSUES PRESENTED AND
APPLICABLE STANDARD OF APPELLATE REVIEW .....................................2

I.     STATEMENT OF ISSUES PRESENTED ..................................2

II.    APPLICABLE STANDARD OF APPELLATE REVIEW ....................2

STATEMENT OF THE CASE .......................................................................4

ARGUMENT ...........................................................................................19

I.     THE BANKRUPTCY COURT MISAPPLIED APPLICABLE
LAW IN AWARDING EGC DEFAULT INTEREST IN LIGHT
OF THE INSOLVENCY OF THE DEBTORS' ESTATES AND
OTHER EQUITABLE CONSIDERATIONS ..........................................19

A.    Whether Postpetition Interest Should be Awarded to an to
an Oversecured Creditor is Governed by Federal Law, not
the Loan Agreement or the Creditor's State Law Rights
and not the U.S. Supreme Court's Decision in *U.S. v. Ron
Pair Enterprises, Inc.*, 489 U.S. 235 (1980)...................................19

B.    The Bankruptcy Court Failed to Properly Consider the
Equitable Considerations that Courts in this Circuit Have
Held are Controlling on the Question of Whether
Pendency Interest Should be Awarded, and When......................22

C.    The Technical Event of Default Based on the Debtors'
Bankruptcy Filings Further Militates Against Awarding
Default Interest ...................................................................30

CONCLUSION ........................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 1111 Myrtle Avenue Group, LLC,*
598 B.R. 729 (Bankr. S.D.N.Y. 2019)..........................................................22, 24

*In re 785 Partners LLC,*
470 B.R. 126 (Bankr. S.D.N.Y. 2012)..............................................7, 20, 22, 23

*In re AMR Corp.,*
490 B.R. 470 (S.D.N.Y. 2013) .............................................................................9

*Babitt v. Vebeliunas (In re Vebeliunas),*
332 F.3d 85 (2d Cir. 2003) ...................................................................................6

*In re Bownetree, LLC,*
2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009)............................21, 28, 31

*Butner v. U.S.,*
440 U.S. 48. 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)............................................20

*Chase Manhattan Bank, N.A. v. Wonder Corp. of America (In re Wonder Corp. of America),*
82 B.R. 186 (D. Conn. 1988)..............................................................................19

*In re Connaught Properties, Inc.,*
176 B.R. 678 (Bankr. D. Conn. 1995)................................................................23

*In re Danise,*
112 B.R. 492 (Bankr. D. Conn. 1990) ...............................................................16

*In re Encore Healthcare Associates,*
312 B.R. 52 ........................................................................................................12

*In re Family Pharmacy, Inc.,*
614 B.R. 58 (8th Cir. BAP, Mar. 19, 2020), *appeal dismissed* (8th Cir. Jul. 7, 2020) .....................................................................................17

*Fischer Enterprises, Inc. v. Geremia (In re Kalian),*
178 B.R. 308 (Bankr. D.R.I. 1995).....................................................................32

*Foss v. Boardwalk Partners (In re Boardwalk* Partners),
   171 B.R. 87, 92 (Bankr. D. Ariz. 1994)............................................................28

*In re Greenwich Showboat Ltd. Partnership*,
   117 B.R. 54 (Bankr. D. Conn. 1990) ...............................................................16

*In re Gulf Coast Oil Corp.*,
   404 B.R. 407 (Bankr. S.D. Tex. 2009) .............................................................11

*Key Bank National Association v. Milham (In re Milham)*,
   141 F.3d 420 (2d Cir. 1998) ...............................................................19, 20, 23

*In re L&N Twins Place, LLC*,
   2019 WL 5258096 (Bankr. S.D.N.Y. Oct. 15, 2019)........................................24

*Labbadia v. Martin* (*In re Martin*),
   2020 WL 5300932 (D. Conn. Sept. 4, 2020)...................................................5, 6

*In re Latex Foam International*,
   2020 WL 2125866 (Bankr. D. Conn. May 4, 2020).................................7, 8, 27

*In re Madison 92nd Street Associates LLC*,
   472 B.R. 189 (Bankr. S.D.N.Y. 2012)..............................................................24

*In re National Computer Communications Corp.*,
   85 B.R. 6 (Bankr. D. Conn. 1988) ...................................................................16

*In re NextWave Personal Comm. Inc.*,
   244 B.R. 253 (Bankr. S.D.N.Y. 2000)..............................................................32

*In re Northwest Airlines Corp.*,
   2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007)...............................9, 28, 31

*O'Brien v. Presidents Holdings, LLC¸*
   2014 WL 12931380 (D. Conn. Feb. 10, 2014)..........................................passim

*In re PHC Assoc.*,
   122 B.R. 181 (Bankr. S.D.N.Y. 1990)................................................................9

*In re Quality Interiors, Inc.*,
   127 B.R. 391 (Bankr. N.D. Ohio 1991).............................................................31

*R² Investments, LDC v. Charter Communications, Inc.* (*In re Charter Communications, Inc.*),
    691 F.3d 476 (2d Cir. 2012) .................................................................6

*In re Residential Capital, LLC*,
    508 B.R. 851 (Bankr. S.D.N.Y. 2014).......................................passim

*Ruskin v. Griffiths*,
    269 F.2d 827 (2d Cir. 1959) ...............................................................24

*Schwartz v. Aquatic Dev. Group, Inc.* (*In re Aquatic Dev. Group, Inc.*),
    352 F.3d 671 (2d Cir.2003) ..................................................................6

*Schwartz v. Geltzer* (*In re Smith*),
    507 F.3d 64 (2d Cir. 2007) ...................................................................6

*In re Toor*,
    477 B.R. 299 (D. Conn. 2012)...............................................................5

*U.S. v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1980)................................................................19, 20, 21

*Urban Communicators PCS Limited Partnership v. Gabriel Capital, L.P.*,
    394 B.R. 325 (S.D.N.Y. 2008) .............................................21, 22, 23

*In re Vanderveer Estates Holdings, Inc.*,
    283 B.R. 122 (Bankr.E.D.N.Y.2002) .................................................22

*Vanston Bondholders Protective Committee v. Green*,
    329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946).........................24, 28

*In re Vest Associates*,
    217 B.R. 696 (Bankr. S.D.N.Y. 1998)...................................21, 22, 23

*In re White*,
    2017 WL 5501487 (D. Conn. Nov. 16, 2017)......................................6

**STATUTES**

11 U.S.C. §363(e) .....................................................................................9

11 U.S.C. §503(b) ............................................................................11

11 U.S.C. § 549 ...............................................................................32

28 U.S.C. §158(a)(1) ..........................................................................4

28 U.S.C. §§1334(b) and 157(b)(2)(B)(A), (B) and (O) ...................4

Bankruptcy Code § 1129 ..................................................................12

**RULES**

Fed. R. Bankr. P. 3003(b)(4).............................................................7

Appellant, the Official Committee of Unsecured Creditors of Latex Foam International LLC *et al*. (the "Committee"), by its attorneys, Pullman & Comley, LLC and Lowenstein Sandler LLP, hereby submits its Appellant's Brief in the above-captioned appeal.

## STATEMENT OF THE BASIS
## OF APPELLATE JURISDICTION

This is an appeal from the Bankruptcy Court's Order Granting Entrepreneur Growth Capital, LLC's Motion for Payment of Secured Creditor Claim and Fee Application, entered July 31, 2020 (ECF[1] No. 670) (the "Default Interest Order"). More specifically, the appeal is from that part of the Default Interest Order that awards Entrepreneur Growth Capital, LLC ("EGC") interest at the default rate in the amount of $250,498.56.[2] The Default Interest Order is a final order and was timely appealed by the by the Committee by the filing of a Notice of Appeal on August 14, 2020 (ECF No. 643).

This Court has jurisdiction to hear appeals from final judgments of the bankruptcy court pursuant to 28 U.S.C. §158(a)(1). The Bankruptcy Court had subject matter jurisdiction to enter the Default Interest Order pursuant to 28 U.S.C. §§1334(b) and 157(b)(2)(B)(A), (B) and (O), and the Order of reference of the

---

[1] Use of the acronym "ECF" in this brief shall be taken to mean the electronic case file number assigned to a pleading or other paper filed with the Bankruptcy Court in the chapter 11 case of Latex Foam International, LLC et al., jointly administered under Case No. 19-51064.

[2] Inclusive of $237,684.19 as of June 15, 2020 and remainder from June 16, 2020 through repayment of principal on or about July 2, 2020. See Default Interest Order, pg. 2 of 2.

United States District Court for the District of Connecticut, dated September 21, 1984 (Daly, C.J.).

**STATEMENT OF ISSUES PRESENTED AND
APPLICABLE STANDARD OF APPELLATE REVIEW**

**I.     STATEMENT OF ISSUES PRESENTED**

The issues presented on this appeal by the Committee are those identified in its Statement of the Issues to be Presented on Appeal and Designation of Items for Record on Appeal, filed with the Bankruptcy Court on August 28, 2020.  They are: whether the Bankruptcy Court erred by approving and awarding, over the Committee's and the Debtors' objections, the request of Appellee, EGC, for interest at the default rate, where (a) no default (yet alone enforceable default) existed (and the Bankruptcy Court did not find any), (b) the Debtors' estates were and are insolvent and other creditors are unlikely to see a recovery from the Debtors' cases, and (c) the chapter 11 cases have been run for and provided the primary benefit to EGC at the expense of all other parties in interest.

**II.    APPLICABLE STANDARD OF APPELLATE REVIEW**

"When reviewing bankruptcy appeals, the district court reviews conclusions of law *de novo* and applies the clearly erroneous standard to findings of fact." *Labbadia v. Martin* (*In re Martin*), 2020 WL 5300932, at *1 (D. Conn. Sept. 4, 2020).  "A finding is clearly erroneous when the reviewing court is left with the

definite and firm conviction that a mistake has been made." *In re Toor*, 477 B.R. 299, 303 (D. Conn. 2012).

When there are mixed questions of law and fact, the standard of review is *de novo*. *Babitt v. Vebeliunas* (*In re Vebeliunas*)*,* 332 F.3d 85, 90 (2d Cir. 2003). Discretionary decisions of the bankruptcy court, or those that are guided by equitable considerations, are reviewed for an abuse of discretion. *R² Investments, LDC v. Charter Communications, Inc.* (*In re Charter Communications, Inc.*), 691 F.3d 476, 483 (2d Cir. 2012); *Schwartz v. Geltzer* (*In re Smith*), 507 F.3d 64, 73 (2d Cir. 2007).

The abuse of discretion standard requires a bankruptcy court's decision to be overturned when it either "'(1) "rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding,' or (2) 'cannot be located within the range of permissible decisions,' even if it is 'not necessarily the product of a legal error or a clearly erroneous factual finding'." *Smith*, 507 F.3d at 73 (quoting *Schwartz v. Aquatic Dev. Group, Inc.* (*In re Aquatic Dev. Group, Inc.*), 352 F.3d 671, 678 (2d Cir.2003)).

The district court may "'affirm, modify, or reverse a bankruptcy court's judgment, order, or decree, or remand with instructions for further proceedings'." *Martin¸* 2020 WL 5300932, at *1 (quoting *In re White*, 2017 WL 5501487, at *1 (D. Conn. Nov. 16, 2017)).

Inasmuch as fixing the appropriate rate of postpetition interest under 11 U.S.C. §506(b) "'rests with the limited discretion of the bankruptcy court,'" and is based on 'equitable considerations,'" *O'Brien v. Presidents Holdings, LLC*¸ 2014 WL 12931380, at *3 (D. Conn. Feb. 10, 2014) (quoting *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012)), the applicable standard of review in this appeal is abuse of discretion. Interpretation and application of Section 506(b), however, is reviewed *de novo*. This appeal involves mixed questions of law and fact, mandating *de novo* review.

## <u>STATEMENT OF THE CASE</u>

On August 8, 2019 (the "<u>Petition Date</u>"), Latex Foam International, LLC *dba* Talalay Global and various related entities (collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (ECF No. 1).[3] The Committee was appointed on August 22, 2010 (ECF No. 69), and retained counsel by orders of the Bankruptcy Court entered on October 23, 2019 (ECF Nos. 229, 230).

Until its debt was paid in full from the proceeds of a court-approved §363 sale (ECF No. 606), EGC was the Debtors' principal secured creditor with a claim as of the Petition Date in the amount of $9,342,934.33 (EGC Proof of Claim, Claim No.

---

[3] Latex is the operating debtor, but four of its affiliates also filed voluntary petitions for chapter 11 relief on August 8, 2019. An order entered on August 14, 2019 directing the joint administration of all five cases under the lead case number, 19-51064 (ECF No. 49). Latex and its four affiliates are hereinafter referred to as the "Debtors."

22).[4]  As of the Petition Date, the Debtors were completely current in loan payments to EGC and remained current in payments through December 2019 (7/15/20 Hr. Tr. 23:16-18[5]).  Moreover, throughout the pendency of the chapter 11 case, EGC was paid the aggregate amount of $791,000 in adequate protection payments[6], with each payment equating to its regular monthly payment of contract principal and non-default interest in the amount of $113,000.[7]  Because the Debtors at all times complied with Bankruptcy Court orders, at no time did EGC issue any notice of default to the Debtors.

The Debtors were authorized to use the cash generated from the operation of their business pursuant to a series of eleven interim cash collateral orders (ECF Nos. 48, 79, 175, 235, 272, 404, 455, 498, 536, 566, 640).  No final cash collateral order was ever entered.  EGC filed a total of seven objections to the Debtors' use of cash

---

[4]  The Debtor's Schedules listed EGC's claim in the amount of $9,327,906.00 (ECF No. 99 at 17), but the filed proof of claim supersedes that listing.  Fed. R. Bankr. P. 3003(b)(4).  The only other secured claim scheduled by the Debtor was in the amount of $26,406.20 (ECF No. 99 at 17).

[5]  This cite reference is to the hearing on EGC's 506(b) Motion.  Citations to testimony presented at hearings before the Bankruptcy Court shall, in general, be in the following format: Date of hearing, with an abbreviated reference to "Hr. Tr." as the "hearing transcript," followed by the page number and line reference in the transcript, which will be separated by a colon.

[6]  In its Memorandum of Decision and Order on Motion for Authority for Continued Use of Cash Collateral and to Provide Adequate Protection, entered on May 4, 2020 (ECF No. 535) (the "5/4/20 Cash Collateral Decision"), the Bankruptcy Court found that EGC had been paid "approximately $800,000 in adequate protection payments …"  The 5/4/20 Cash Collateral Decision is published as *In re Latex Foam International*, 2020 WL 2125866 (Bankr. D. Conn. May 4, 2020).

[7]  At the hearing on the 506(b) Motion, counsel for EGC acknowledged that the only monthly payments that were not made during the chapter 11 case were in the months of January, March, May and June 2020 (7/15/20 Hr. Tr. 9:14-15).  But EGC itself agreed for the Debtor not to make these four payments because EGC refused to approve the Debtors' allowance and payment of reasonable fees/expenses for the retained professionals of the Debtor and the Committee, as well as additional necessary chapter 11 operating expenses.  The Debtor has fully complied with the Court's cash collateral orders, including budgets annexed thereto. See ECF Nos. 79 at 9, 175 at 9, 235 at 8, 272 at 12, 428-1 at 1, 498 at 11.

collateral, contending in each one that (among other things) the value of the Debtors' assets exceeded EGC's debt and that EGC was entitled to default interest (ECF Nos. 25, 216, 272, 396, 433, 488, 516).

Indeed, the Bankruptcy Court found in May 2020 that EGC was oversecured, based on the value certain of the Debtors' assets (*i.e.*, not all assets were valued) and the amount of EGC's claim, and that the resulting "equity cushion," in and of itself, provided EGC with adequate protection for the Debtors' use of cash collateral (5/4/20 Cash Collateral Decision at 11-12). An equity cushion of at least "north of twenty percent" has been held to be sufficiently large to provide "adequate protection" under 11 U.S.C. §363(e). *In re AMR Corp.*, 490 B.R. 470, 478 (S.D.N.Y. 2013).

Not only did EGC lodge repeated objections to the use of cash collateral, which impeded the chapter 11 process,[8] it objected to the Committee's statutory right to retain a financial advisor on the basis that, *inter alia¸* if the Debtors' proposed §363 sale of their assets occurred, "the unsecured creditor class will receive payment of its claims" (ECF No. 243, ¶12).[9] Thus, EGC again took the position that the estates were solvent. EGC also objected to the Debtors' proposed retention of an

---

[8] Oversecured creditors have been denied legal fees under §506(b) for objecting to and litigating cash collateral matters "'where the secured claim is not under threat because of the large equity cushion'." *In re Northwest Airlines Corp.*, 2007 WL 3376895, at *3 (Bankr. S.D.N.Y. Nov. 9, 2007) (quoting *In re PHC Assoc.*, 122 B.R. 181, 204 (Bankr. S.D.N.Y. 1990)).

[9] The Court approved the Committees' retention of its financial advisor over EGC's protests by Order entered on November 12, 2019 (ECF No. 278).

investment banker, an entity selected by the Debtors to market their business for sale and thus to monetize EGC's collateral, on the basis that the investment banker should not be paid if EGC chose to credit bid at the sale and its credit bid was the winning bid (ECF No. 307, ¶¶4, 5).[10] EGC's objection was resolved by agreement not to pursue a sale below a certain threshold (ECF No. 359, at 2).

On April 30, 2020, after a marketing process yielded a stalking horse bidder, PolyCap Advisors, LLC, the Debtors filed a Motion for Entry of (I) An Order (A) Approving Bidding Procedures and Bidder Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into Stalking Horse Agreement and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) An Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Any Interest in Such Assets and (B) Granting Certain Related Relief (ECF No. 528) (the "363 Motion"). On May 11, 2020, the Bankruptcy Court entered an Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets; (II) Providing Certain Protections to PolyCap Advisors, LLC; and (III) Granting Related Relief (ECF No. 550).

After the Debtors secured a qualified, competing bid, a virtual auction of the Debtors' assets took place on June 5, 2020 as set forth in the Notice of Virtual

---

[10]    Apparently, EGC found it acceptable for the Debtors to retain an investment banker to engage in a full marketing and sale process for its collateral, which would undoubtedly provide the best indication of its market value, and then if EGC did not like the results, *i.e.,* if it was not paid in full, it could simply credit bid and leave the investment banker with no means by which to get paid.

Auction filed on June 3, 2020 (ECF No. 576). Hearings on the 363 Motion followed on June 12 and 16, 2020. An entity known as Artilat NV was reported as the winning bidder at the auction with an all-cash bid of $10.5 million (6/12/20 Hr. Tr. 27:12-13), and EGC represented that its secured claim "will approach $9.5 million" (6/16/20 Hr. Tr. 7:12-15). By testimonial proffer, the record was established that administrative claims[11] "in the case would be some million dollars or more" (6/12/20 Hr. Tr. 84:12-14), and administrative claims could involve post-petition claims of trade creditors who have supported the Debtors' chapter 11 case by extending credit (and thus preserving going concern value of the Debtors) and enabling EGC to monetize its collateral through the sale of the Debtors' operating business (as opposed to a fire liquidations sale). With an EGC claim of approximately $9.5 million, the sale proceeds are insufficient to pay all administrative claims in full, let alone leave anything for general unsecured creditors with claims ranging from approximately $2.5 million to $13 million.

Prior to the sale hearings, the Committee objected to the approval of the sale on the ground that, if consummated, it would not provide sufficient funds to pay the administrative expenses of the chapter 11 case, including unpaid trade payables, §503(b)(9) claims and professional fees (ECF No. 584), and, in the alternative, requested that sufficient sale proceeds be escrowed to ensure administrative

---

[11] Meaning, claims subject to allowance under 11 U.S.C. §503(b).

solvency. *See e.g. In re Gulf Coast Oil Corp.,* 404 B.R. 407 (Bankr. S.D. Tex. 2009) (denying approval of §363 sale where the only administrative expenses that would be paid were those the purchaser selected for payment, and stating, disapprovingly, that "the essence of the proposed transaction is a foreclosure supplemented materially by a release, by assignment of executory contracts (but only the contracts chosen by the secured lender), by a federal court order eliminating any successor liability, and by preservation of the going concern. Congress provided a process by which these benefits could be obtained. That scheme requires bargaining, voting, and a determination by the Court that Bankruptcy Code § 1129 requirements are met. The Court sees no authority to provide the benefits of the Congressional scheme in this case without compliance with Congressional requirements"); *In re Encore Healthcare Associates*, 312 B.R. 52, 57-58, n. 10 (Bankr. E.D. Pa. 2004 (denying sale procedures motion for sale that would not provide any proceeds for payment of administrative expenses, and stating that "it is clear that Chapter 11 liquidations are still subject to the proscriptions of Chapter 11 concerning, *inter alia,* the filing of a plan. Recognizing as much, most secured creditors understand the necessity of making some distribution available to other creditors as the price of a court-approved sale. An asset sale under the facts presented to me goes beyond the most liberal interpretation of *Lionel*"").

By order entered on June 17, 2020 (ECF No. 606) (the "Sale Order"), the Bankruptcy Court overruled the Committee's objection and approved the sale to Artilat.  The Sale closed on July 2, 2020.  Pursuant to the mechanism set forth in ¶27 of the Sale Order, at closing, the Debtors paid the principal amount of EGC's claim in the amount of $9,043,973.74 (which had been reduced by approximately $300,000 by way of post-petition adequate protection payments), plus non-default interest that had accrued up to June 8, 2020 in amount of $10,551.44 and *per diem* interest at the non-default rate of $1,325.42 per day from June 9, 2020 through the date of closing.

On June 22, 2020, EGC filed its Motion for Payment of Secured Creditor's Claim and Fee Application (the "506(b) Motion"), whereby it sought allowance of interest at the default rate, attorneys' fees and other charges.  The default interest sought was based on a provision in its Second Amended and Restated Loan and Security Agreement[12] (the "Loan Agreement") defining "Default Rate," which is three percentage points above the non-default rate of interest (EGC Proof of Claim, Claim No. 22-1, Ex. B, p. 4).

The Default Rate was allegedly triggered upon the occurrence of a technical "Event of Default" (Loan Agreement §2.7).  An "Event of Default" is defined first

---

[12] The original lender under the Loan Agreement was SummitBridge National Investments IV LLC.  EGC acquired SummitBridge's debt through an assignment of the Loan Agreement and documents related thereto (506(b) Motion ¶13), at a substantial discount.

at page 7 of the Loan Agreement as "any event specified as such in section 8.1 hereof, provided that there have been satisfied any requirement in connection with such event for the giving of notice or the lapse of time, or both."

On June 29, 2020, the Committee and the Debtors each filed separate objections to the 506(b) Motion.  A hearing on the 506(b) Motion was held on July 15, 2020, and the matter was taken under advisement.  By the Default Interest Order entered on July 31, 2020, the objections were overruled and EGC was awarded the following amounts (in addition to those previously awarded and paid) on account of its secured claim:

| | |
|---|---|
| Default interest | $250,498.56[13] |
| Attorneys' fees | $222,352.62[14] |
| Appraisal expense | $6,967.43 |

Thus, together with the repayment of principal, EGC received approximately 90.5% of the total sale proceeds.[15]  Following payment of certain direct sale expenses due to the Debtors' investment banker (approximately $580,000) and the stalking horse bidder ($100,000), the estates were left will less than $400,000 in sale proceeds and "some million dollars or more" of administrative claims.

It is beyond dispute EGC was the primary if not only beneficiary of the §363 sale to Artilat, as well as the entire chapter 11 process.  Many trade creditors and

---

[13]    Calculated through closing of the sale and repayment of EGC's debt in full.

[14]    Inclusive of $60,000 in legal fees paid by the Debtors during the chapter 11 case.

[15]    EGC also received $791,000 in "adequate protection" payments during the chapter 11 case.

case professionals, for example, provided services and goods to the Debtors post-petition. Remaining sale proceeds are insufficient to payment those administrative claims.

That the Debtors would not be able to maximize the value of their assets outside of chapter 11 is clear. For instance, the Sale Order makes clear that Artilat would not have acquired the Debtors' assets absent the benefit of the bankruptcy process and the Debtors' ability to sell their assets "fee and clear." *See* Sale Order, ¶ R.[16] Given the shortfall of the sale proceeds after payments to EGC and certain limited sale related expenses, general unsecured creditors will likely receive little if any recovery from the process.

General unsecured claims in the case total at least $2,741,135.01 according to Schedule F filed with the Bankruptcy Court on August 29, 2019 by Latex Foam International, LLC (ECF No. 86, at 11-32).[17] Filed claims (not yet reconciled) have increased that number to $13,000,000 or more. Thus, irrespective of whether the sale proceeds will be sufficient to cover administrative expenses in full, the Debtors' estates are demonstrably insolvent.

---

[16] "The Buyer would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtors, the Debtors' estates and the Debtors' creditors, if the Purchased Assets were not sold to the Buyer free and clear of all interests or if the Buyer would, or in the future could, be liable for any interests in the Purchased Assets, except as specifically provided in the APA."

[17] The claims register in Latex's chapter 11 case reflects total claims filed in the amount of $15,344,120.70, of which $9,348,487.12 are secured and $426,534.05 are priority. Subtracting the secured and priority claims from the total leaves $5,569,099.53 in general unsecured claims.

Although the Bankruptcy Court did not, it its Default Interest Order, set forth any basis for awarding EGC the full amount of its default interest, some of the colloquy at the hearing is informative of the Bankruptcy Court's misunderstanding and/or misapplication of the applicable law and the facts. The Bankruptcy Court seemed to be of the view that the equitable considerations to be given the most weight in determining whether to award default interest were the (1) difference between the non-default and default rates of interest, which was three percent, and (2) the manner in which EGC applied its adequate protection payments (7/15/20 Hr. Tr. 19:6-22, 20:13-19).

This second consideration was apparently adopted from EGC's argument that EGC could have, but did not, apply the adequate protection payments first to reimbursement of attorneys' fees and expenses and then to interest "and any default interest that the Court allows" (7/15/20 Hr. Tr. 6:8-12). That argument is specious, however, as EGC's entitlement to attorneys' fees and expenses under §506(b) first had to be approved as reasonable by the bankruptcy court upon separate application, *In re Greenwich Showboat Ltd. Partnership*, 117 B.R. 54, 60 (Bankr. D. Conn. 1990); *In re Danise*, 112 B.R. 492, 495 (Bankr. D. Conn. 1990)[18], and in any event, a secured creditor is not entitled to an interim allowance of attorneys' fees under

---

[18] Pursuant to the various cash collateral orders entered in the case, EGC was authorized to receive and was separately paid for its attorneys' fees in the amount of $60,000, in addition to the $791,000 in adequate protection payments it received during the case.

§506(b) because its secured position must be judged at the conclusion of the reorganization proceeding. *In re National Computer Communications Corp.,* 85 B.R. 6, 7-8 (Bankr. D. Conn. 1988). Similarly, the adequate protection payments could not have been applied to default interest until the Bankruptcy Court determined EGC's entitlement to default interest. Additionally, as Debtors' counsel pointed out, EGC presented no mathematical computation of what the monetary difference would have been if the adequate protection payments had been allocated any differently than EGC had contended they were applied (7/15/20 Hr. Tr. 19:24-25).

The Bankruptcy Court also appeared to place, improperly, particular emphasis on the fact that "[t]he contract that [debtor] signed when it borrowed the money that said if [debtor is] in default, these are all of things that the secured creditor can do and claim as part of its debt, number one" (7/15/20 Hr. Tr. 21:7-11). The "[n]umber two" consideration identified by the Bankruptcy Court was the fact that it had determined EGC to be oversecured at a prior evidentiary hearing, which then entitled EGC to seek additions to its claim (7/15/20 Hr. Tr. 21:12-16). These two considerations, however, have nothing to do with the four equitable considerations courts have identified as material to determining whether payment of interest at the default rate is warranted. *See e.g. O'Brien v. Presidents Holdings, LLC*, 2014 WL 12931380, at *3 (D. Conn. Feb. 10, 2014) (stating that "there appears to be a

consensus in this Circuit" on these four considerations).[19]  The Bankruptcy Court has misapplied applicable law.

As to Judge Arterton's decision in *O'Brien*, the Bankruptcy Court appeared to read it as simply authorizing some reduction in default interest when there is a wide differential between the non-default and default rates of interest, but not that it may be denied completely if the estates are insolvent (7/15/20 Hr. Tr. 21:22-22:3) (stating that what Judge Arterton "said was I'm going to reduce that amount.  I'm not going to allow them to have 24 percent.  I'm going to reduce it under the circumstances of that case"); (7/15/20 Hr. Tr. 32:25-33:1) (stating that Judge Arterton "didn't deny it completely[,] [s]he just reduced it").

The Bankruptcy Court also seemed hostile to *O'Brien's* decision to reduce default rate interest "to [the] highest amount that would allow the debtor to repay unsecured creditors" (7/15/20 Hr. Tr. 42:14-43:14).  That, however, was the ruling in *O'Brien*. *See O'Brien,* 2014 WL 12931380, at *5 ("the Court affirms the Bankruptcy Court order allowing post-petition default interest, but reduces the award of post-petition interest to the highest amount that allows Appellant to repay its unsecured creditors in full"), and the vast majority of reported decisions.

---

[19]  The Bankruptcy Court, in so ruling, may have misapplied the precedent in the Second Circuit and, instead, applied the reasoning of an outlier non-binding decision in *In re Family Pharmacy, Inc.*, 614 B.R. 58 (8th Cir. BAP, Mar. 19, 2020), *appeal dismissed* (8th Cir. Jul. 7, 2020).  EGC urged the Bankruptcy Court to apply this outlier decision.  (7/15/20 Hr. Tr. 7:3-8; 11:22-24)

Another point the Bankruptcy Court appeared to seize on was EGC's argument that unsecured creditors would not be harmed by an award of default interest because if, as proffered by the Committee, there were insufficient assets in the estates to pay administrative claims, unsecured creditors would not receive a recovery either way, *i.e.*, they would not be harmed by an award of default interest because even if it was denied, they still would receive no recovery due to the administratively insolvency of the Debtors' estates (7/15/20 Hr. Tr. 10:23-11:13). Even though administrative claimants are also unsecured creditors, and the inability to pay them in full would undoubtedly mean the estates were insolvent, the Bankruptcy Court appeared to credit, inappropriately, this self-serving argument (7/15/20 Hr. Tr. 33:8-16).

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court committed reversible errors in awarding EGC approximately $250,000 in default interest where the Debtors' estates are insolvent and EGC did nothing to aid in the Debtors' chapter 11 value-maximizing efforts. During these chapter 11 cases, premised on the sale of the Debtors' business, EGC has selfishly limited the Debtors' operational and chapter 11 administrative spending, all the while stripping the Debtors of crucial liquidity through "adequate protection" payments. In the end, EGC was paid in full on account of its secured

claim that it acquired at a discount prior to the Petition Date, consisting of principal, non-default interest and over $220,000 in attorneys' fees and other expenses.

In awarding EGC default interest, the Bankruptcy Court misapplied section 506(b) of the Bankruptcy Code, as well as the four equitable factors considered by courts in the Second Circuit, and elsewhere, to determine if default interest is appropriate. As a result, EGC walked away with over 90% of the sale proceeds (and over 95% if one accounts for fees paid to the investment banker and stalking horse bidder), and the estates were left scrambling to pay administrative/priority claimants and unsecured creditors with virtually no hope of recovery.

The Bankruptcy Court also failed to properly recognize and give appropriate weight to the estate insolvency and the impairment of junior creditors as one of the "equitable considerations" that rebut the presumption of contractual default interest. In the process, the Bankruptcy Court also misinterpreted the District Court's highly persuasive decision in *O'Brien v. Presidents Holdings, LLC*, 2014 WL 12931380 (D. Conn. Feb. 10, 2014), as simply requiring the reduction of default interest when there is a significant difference between the non-default and default rates, and not as requiring the denial of default interest unless and until unsecured creditors are paid in full, as *O'Brien* actually held.

The prejudice to unsecured creditors resulting from the Bankruptcy Court's ruling is palpable. Unsecured creditors have supported the Debtors' sale efforts by

providing unsecured credit (through product and services). This enabled the Debtors to maintain a going concern value of their business and, in turn, facilitated EGC's efforts to monetize its claims outside of the only viable alternative, which would have been a fire-sale liquidation in which EGC would likely recover no more than half of its claim. For all these efforts, unsecured creditors were denied the potential of a recovery ranging from 3% to 8%. Simply put, unsecured creditors were put deeper behind "the eight ball" by the award of default interest.

The decision in *In re Residential Capital, LLC,* 508 B.R. 851 (Bankr. S.D.N.Y. 2014), supports reversal. There, the oversecured creditor was instrumental in facilitating over $14 billion in postpetition financing that enabled the debtor to continue operating as a going-concern, maximize the value of its assets and provide a return to unsecured creditors while covering administrative expenses in full. That is clearly not what occurred in this case, where the remaining sale proceeds are insufficient to pay administrative claims in full, let alone to provide a recovery for general unsecured creditors, and the oversecured creditor here engaged in behavior that impeded the chapter 11 process.

The inequitable result of awarding default interest is therefore apparent, as EGC in effect used the chapter 11 process – and the administrative costs the estates incurred to get to the point of a sale – to get paid in full and avoid having to liquidate

its collateral at fire sale value, while likely leaving the estate administratively insolvent and general unsecured creditors with at most a nominal recovery.

The Bankruptcy Court also failed to appreciate the nature of the "default" EGC relied upon for triggering of default interest – the Debtors' bankruptcy filing. Courts have repeatedly held that such "technical" defaults should not be elevated to prejudice unsecured creditors where, as here, a secured creditor has done nothing to contribute to the success of the case. Because the Debtors have fully complied with the Bankruptcy Court's eleven interim cash collateral orders and EGC reaped the primary benefit of the chapter 11, an award of default interest to EGC was reversible error.

## ARGUMENT

I. **THE BANKRUPTCY COURT MISAPPLIED APPLICABLE LAW IN AWARDING EGC DEFAULT INTEREST IN LIGHT OF THE INSOLVENCY OF THE DEBTORS' ESTATES AND OTHER EQUITABLE CONSIDERATIONS**

   A. **Whether Postpetition Interest Should be Awarded to an to an Oversecured Creditor is Governed by Federal Law, not the Loan Agreement or the Creditor's State Law Rights and not the U.S. Supreme Court's Decision in *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1980)**

The allowance of additional fees and costs under 11 U.S.C. §506(b) is a matter of federal, not state law. *Chase Manhattan Bank, N.A. v. Wonder Corp. of America (In re Wonder Corp. of America)*, 82 B.R. 186, 189 (D. Conn. 1988). Federal law, and in particular, 11 U.S.C. §506(b), also governs whether an oversecured creditor

is entitled to default interest that accrues after the filing of a bankruptcy petition, so-called "pendency interest."

As the Second Circuit has instructed, "pendency interest is not based upon contract," *Key Bank National Association v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998), and as more particularly observed in *In re 785 Partners LLC*, 470 B.R. 126 (Bankr. S.D.N.Y. 2012):

> [s]ection 506(b) does not state that the oversecured creditor is entitled to collect post-petition, or pendency, interest at the contract rate. Milham, 141 F.3d at 423. Pendency interest is not based on contract and fixing the appropriate rate rests with the "limited discretion" of the bankruptcy court. Id.

*Id.* at 134. *See also O'Brien v. Presidents Holdings, LLC,* 2014 WL 12931380, at *3 (D. Conn. Feb. 10, 2014) ("[a]lthough § 506(b) permits post-petition interest, it does not mandate that such interest be calculated at the contract default rate"). Thus, any argument that the default interest question should be resolved based on state contract law in accordance with the decision in *Butner v. U.S.*, 440 U.S. 48, 55. 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (property interests in bankruptcy defined by state law unless some federal interest requires a different result), which is what EGC argued to the Bankruptcy Court (7/15/20 Hr. Tr. 7:13-19), is flatly incorrect. The same would hold true for the Bankruptcy Court's apparent emphasis on "the contract [the Debtors] signed" that provided for default interest to be paid to EGC in the event of a default ((7/15/20 Hr. Tr. 21:7-11).

EGC also incorrectly argued to the Bankruptcy Court that the matter of whether it should be awarded pendency interest should be controlled by the U.S. Supreme Court's decision in *Ron Pair*, which according to EGC, holds "that its an unqualified rate[20] [sic.] of the secured creditor to receive the interest rate that's set forth in its own documents" (7/15/20 Hr. Tr. 7:9-12). The notion that *Ron Pair* controls the calculation of pendency interest has been emphatically rejected by Courts from this Circuit, and elsewhere. *See Urban Communicators PCS Limited Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008) ("*Ron Pair* does not address the issue of how post-petition interest should be calculated"); *In re Bownetree, LLC*, 2009 WL 2226107, at *4 (Bankr. E.D.N.Y. July 24, 2009) (stating that "courts have found that the granting of interest under Section 506(b) is not dictated by the loan agreement", and citing *Ron Pair* as finding that the phrase "interest on such claim" in §506(b) "is not limited by the subsequent language 'provided for under the agreement under which such claim arose,' and therefore the granting of interest is not limited by the terms of the loan agreement"); *In re Vest Associates*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("Section 506(b) is silent, however, as to what rate of interest is to be applied. Neither *Ron Pair* nor *Rake v. Wade* fills the hole").

---

[20] The word, "rate," was transcribed, but based on the context, it is clear that the word that was actually used was "right."

B. **The Bankruptcy Court Failed to Properly Consider the Equitable Considerations that Courts in this Circuit Have Held are Controlling on the Question of Whether Pendency Interest Should be Awarded, and When**

The rule developed by the courts in this Circuit is that there is "a presumption in favor of applying a contractual default rate of interest, 'subject to equitable considerations'." *Urban Communicators,* 394 B.R. at 338 (quoting *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr.E.D.N.Y.2002); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr.S.D.N.Y.1998)). These equitable considerations were succinctly summarized in *O'Brien* as follows:

> There appears to be a consensus in this Circuit that "[t]he power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *In re 785 Partners LLC*, 470 B.R. at 134; see also *In Re Urban Communicators PCS Ltd.*, 394 B.R. 325, 338 (S.D.N.Y. 2008) (noting that "equitable considerations" are typically limited to these four circumstances).

*O'Brien*, at *3. More recent authority confirms that these four equitable circumstances, formulated in the disjunctive, remain the ones to consider in determining whether and to what extent default interest should be awarded. *See In re 1111 Myrtle Avenue Group, LLC*, 598 B.R. 729, 740-41 (Bankr. S.D.N.Y. 2019).

In the context of considering these equitable concerns, "'a debtor's solvency is an important factor in determining whether default interest should be allowed'." *O'Brien*, at \*3 (quoting *In re Vest Associates*, 217 B.R. 696, 703 (Bankr. S.D.N.Y. 1998)). Indeed, in examining the four equitable considerations she previously identified as material to the default interest question, Judge Arterton found that there was no creditor misconduct, that enforcing the default rate would not impair the debtor's fresh start, and that the default interest rate was not a penalty. *Id.* at \*4. Thus, it was estate insolvency, and the resulting impact it would have on unsecured creditors if the full amount of default interest were awarded, that was the primary basis for *O'Brien's* holding "that the award of post-petition interest is reduced to the highest amount **that would allow Appellant to pay all of its creditors**." *Id.* at \*5. (emphasis added).

The paramount importance of this factor was underscored by EGC itself. In all of the cases cited in EGC's 506 Motion (506(b) Motion at 10-12[21]), the debtor **was solvent** or the unsecured creditors were otherwise paid in full or substantially in full. *See Urban Communicators*, 394 B.R. at 338 (S.D.N.Y. 2008) ("[h]ere, the unsecured creditors will be fully compensated …"); *785 Partners*, 470 B.R. at 134 ("the Debtor has failed to offer proof that the application of the Default Rate will

---

[21] The Second Circuit in *Key Bank National Association v. Milham (In re Milham)*, 141 F.3d 420 (2d Cir. 1998) did not address the proper rate of pendency interest, and neither did the court in *In re Connaught Properties, Inc.*, 176 B.R. 678, 686 (Bankr. D. Conn. 1995) ("it is not clear from the question reserved for decision whether the issue of the post-petition interest rate has been waived, and I do not address it here").

harm the unsecured creditors or impair its fresh start. To the contrary, the Debtor proposes to pay the unsecured creditors in full and permit equity to retain its interests"); *111 Myrtle Avenue Group*, 598 B.R. at 743 ("[t]he Debtor is solvent. Pursuant to the Debtor's Chapter 11 Plan, all unsecured creditors were paid in full"); *Ruskin v. Griffiths,* 269 F.2d 827, 830 (2d Cir. 1959) ("[i]n *Vanston*, the debtor was insolvent, and in our case it appears the debtor is solvent," and phrasing the issue as a "contest between a debtor's creditor and its stockholders"); *In re L&N Twins Place, LLC*, 2019 WL 5258096, at * (Bankr. S.D.N.Y. Oct. 15, 2019) ("[a]t all relevant times, Debtor has been solvent").[22] The one case cited by EGC where unsecured creditors would not have been paid in full if the default interest had been awarded as requested, was *O'Brien*, and there, the default interest was not payable unless and until unsecured creditors were paid in full. *O'Brien*, at *5.

A consideration of *In re Residential Capital, LLC,* 508 B.R. 851 (Bankr. S.D.N.Y. 2014)[23] further demonstrates that the Bankruptcy Court committed

---

[22] It is noteworthy that counsel for EGC represented to the Bankruptcy Court that "in many, many, many cases --- we could cite pages --- … bankruptcy courts have allowed default interest even though unsecured creditors are not being paid in full" (7/15/20 Hr. Tr. 8:1-3), yet he was not able to cite even a single case allowing default interest in that situation in the 506(b) Motion. The movant in the *O'Brien* case suffered from similar shortcomings. *O'Brien,* at *4 ("Appellee has not drawn the Court's attention to any cases in which a court awarded post-petition interest at the contract default rate where the estate was insolvent").

[23] Another case not cited by EGC in the 506(b) Motion, but mentioned by the Bankruptcy Court (7/15/20 Hr. Tr. 18:19-20), is *In re Madison 92nd Street Associates LLC*, 472 B.R. 189 (Bankr. S.D.N.Y. 2012). In that case, however, the bankruptcy court considered it material that at the confirmation hearing on the debtor's plan, the debtor's counsel represented there was a possibility of paying all unsecured creditors in full, as well as all priority and administrative claims, and thus, concluded that "the debtor has failed to demonstrate whether and to what extent the 9% rate will prejudice the unsecured creditors…" *Id.* at 199. In this case, there would unquestionably be prejudice to the administrative claimants, who are unsecured, or if they end up getting satisfied, to the general unsecured creditors, if the contractual default interest award to EGC is upheld.

reversible errors. *ResCap* involved a request for payment of interest at the default rate where unsecured creditors were not projected to receive full recovery, but an estimated recovery ranging "from nine percent to just over thirty-six percent". *Id.* at 859. The *ResCap* court did <u>not</u> allow default interest from the petition date (*i.e.*, the technical event of default), but only from a later date triggered by the maturity date of the loan. *Id* at 862.

And, the equitable factors involved here are much stronger than in *ResCap* for denial of default interest. For one, the oversecured creditor in *ResCap* was instrumental to the success of the bankruptcy case, in that its prepetition loan amendment, in the form of "Amendment Ten," was viewed by the bankruptcy court as an important "piece of the Debtors' postpetition financing structure, negotiated in the immediate run-up to the bankruptcy filing," *id.* at 860, as it helped facilitate a $1.450 billion DIP loan from Barclays Bank and additional postpetition financing from a non-debtor parent in the amount of $200 million. *Id.* Thus "[v]iewing Amendment Ten in the context of ResCap arranging substantial postpetition financing, … all of which enabled ResCap and its affiliates to continue operating as a going concern during bankruptcy," the bankruptcy court found it would not be inequitable to unsecured creditors if it enforced the contractual default rate because the "post-bankruptcy-filing financing allowed ResCap to maximize proceeds from

the sale of its main businesses, thereby maximizing recoveries for all secured and unsecured creditors." *Id.* at 860-61.

Here, unlike Citibank in *ResCap,* EGC did not provide or help facilitate any postpetition financing or otherwise enable the Debtors' chapter 11 case to succeed. EGC did the opposite. Not only did EGC refuse to infuse any new funds into the Debtors post-petition to preserve the Debtors' going concern, EGC drained the Debtors of $791,000 of cash (via alleged "adequate protection payments" during the pendency of the chapter 11 cases) while objecting at practically every turn to the Debtors' use of cash collateral and exercising tight control over the Debtors' operating budgets. This included withholding its consent to the use of any cash collateral to pay the Debtors' or the Committee's professionals, except for a $30,000 carve-out for the Committee early in the case (Third Interim Cash Collateral Order, ECF No. 175 ¶5l), and additional carveouts (which were largely inadequate for the amount of work necessary) for all professionals in the case pursuant to the Fifth Interim Cash Collateral Order.[24] EGC also restricted the Debtors' operational spending. And at one point in the case, EGC even tried to shut the Debtors down by objecting to the use of any cash collateral (ECF No. 516), which forced a contested evidentiary hearing and led to the Bankruptcy Court's 5/4/20 Cash

---

[24] There were a total of eight retained professionals in the case. The aggregate amount of the carve-outs in the Fifth Interim Cash Collateral Order was $499,000 (Fifth Interim Cash Collateral Order, ECF No. 272, ¶5l(i)-(iv), DIP Budget at 12). This fell far short of the professional fees accrued in the case, and represents just 58.6% of the adequate protection payments and legal fees EGC, alone, was paid ($851,000).

Collateral Decision.  *In re Latex Foam International*, 2020 WL 2125866 (Bankr. D. Conn. May 4, 2020).

Even worse, EGC's budgetary restraints have caused the Debtors to incur post-petition trade credit, which remains outstanding in light of the lack of sufficient sale proceeds.

Apart from EGC's value destructive conduct in the case, in *ResCap*, there was no issue of administrative insolvency, and unsecured creditors were to receive a recovery of between 9% and 36%.  Thus, the administrative costs of running ResCap's case to a resolution where the secured creditors were paid in full and there was a significant return to unsecured creditors, were fully covered.  Critically, in finding that unsecured creditors would not be unfairly prejudiced by allowance of default interest triggered mid-case (and not as of the Petition Date as here), the *ResCap* court held that even if denied, the amount of default interest would provide only a nominal  increase in unsecured creditor recoveries by "roughly two-tenths of a percent" (*i.e.*, .002%)  *Id*. at 860.  Here, in stark contrast, unsecured creditor recoveries could increase from the current zero to approximately eight percent!  This is a meaningful difference and real evidence of prejudice to unsecured creditors.

In sum, *ResCap* does not provide support for awarding EGC its contractual default interest in the circumstances of this case.  *See ResCap*, 508 B.R. at 859 (stating that "[i]n many or even most cases involving insolvent debtors, the balance

may well fall on the side of the junior secured or unsecured creditors – they are the ones that will have their distributions reduced when the oversecured creditor is awarded postpetition interest at the contract default rate"). And, as it further cautioned, "[a]ll of the facts and circumstances of the case should be examined." *Id*. at 860. In fact, *ResCap* and its thorough analysis warrants denial of default interest here unless and until unsecured creditors are paid in full.

Indeed, many cases, *O'Brien* among them, do hold that based on the debtor's insolvency alone and the impact it would have on junior creditors, it is not appropriate or "equitable" to award postpetition default interest to an oversecured creditor. *See e.g. In re Bownetree,* LLC, 2009 WL 2226107, at *4 (Bankr. E.D.N.Y. July 24, 2009) (noting that "enforcement of the default rate would have an adverse affect on other creditors in this case"): *In re Northwest Airlines Corp.* 2007 WL 3376895, at *6 (Bankr. S.D.N.Y. Nov. 7, 2007) (emphasizing that "there is no question as to the insolvency of the debtors and the fact that the recovery of other creditors would be diminished by a grant of default interest"); *Foss v. Boardwalk Partners (In re Boardwalk* Partners), 171 B.R. 87, 92 (Bankr. D. Ariz. 1994) (stating that additional default interest "comes directly out of the hide of junior creditors, not from the Debtor, and allowing it to be paid would be contrary to the policy of 'ratable distribution of assets among the bankrupts' creditors'") (quoting *Vanston*

*Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946)).

As such, the Bankruptcy Court erred in applying Section 506(b) and awarding default interest to an oversecured creditor. The Debtors were current on the loan and paid EGC handsome "adequate protection payments," and at the same time worked to maximize the value of EGC's collateral. A technical default (*ResCap* at 862) should not be enforced to penalize the Debtors for their chapter 11 filing. Unsecured creditors will be substantially prejudiced if the Bankruptcy Court's Default Interest Order is not reversed.

It bears further emphasis that the Bankruptcy Court in this case, like the bankruptcy court in *O'Brien*, appears to have placed controlling weight on "the contract [the Debtors] signed" that provided for default interest to be paid to EGC in the event of a default (7/15/20 Hr. Tr. 21:7-11). *Compare O'Brien,* 2014 WL 12931380, at *5 (criticizing bankruptcy court ruling because "the Bankruptcy Court declined to consider the effect of an award of 24% post-petition interest on the unsecured creditors, finding that the balance of the equities favored Appellee, as a secured creditor, because the unsecured creditors had not bargained for security, while Appellee had bargained for default interest").

Similarly, here, the Bankruptcy Court declined to consider the adverse impact it would have on unsecured administrative creditors or general unsecured creditors

if default interest were awarded to EGC, and instead, focused on the loan agreement the Debtors signed that provided for default interest to EGC in the event of a default. This is reversible error, as it was in *O'Brien.*

The Bankruptcy Court also placed undue weight on the fact that there was a modest differential between the non-default and default rate of interest under EGC's loan documents which, unlike in *O'Brien*, did not have to be reduced (7/15/20 Hr. Tr. 21:22-22:3). In placing emphasis on this factor, the Bankruptcy Court overlooked that the spread between the non-default and default rates of interest was considered relevant in *O'Brien* to determine whether the default rate was a penalty, *O'Brien*, at *4, and should not impact the independent, equitable consideration of whether awarding default interest would harm junior creditors. This is an additional reason for holding that the Bankruptcy Court misapplied §506(b) in awarding EGC its default interest.

This Court should follow *O'Brien*, and the legal analysis of *ResCap*, and deny any default interest to EGC as the Debtors are unquestionably insolvent and every dollar in default interest that is paid to EGC will impair either administrative claimants or the general unsecured creditors.

C.    **The Technical Event of Default Based on the Debtors' Bankruptcy Filings Further Militates Against Awarding Default Interest**

It is undisputed that the Debtors were not in default under the Loan Agreement as of the Petition Date. EGC claims, however, that defaults occurred when the

Debtors filed for bankruptcy protection[25] (506(b) Motion ¶19) and "ceased making the monthly payments due to EGC under the Loan Documents … until entry of the cash collateral orders in these cases providing for such payments" (506(b) Motion ¶26). These alleged "defaults" are an insufficient basis upon which to sustain an award of default interest.

When the default relied upon to trigger default interest is the filing of a bankruptcy, and the lender's claim has been cured or provided for in full under a chapter 11 plan, courts refuse to allow the "technical default" brought about by the bankruptcy filing to serve as a basis for an award of default interest. *See In re Bownetree, LLC*¸ 2009 WL 2226107, at *4-5 (Bankr. E.D.N.Y. July 24, 2009); *In re Northwest Airlines Corp.*, 2007 WL 3376895, at *6 (Bankr. S.D.N.Y. Nov. 9, 2007). *See also ResCap.*, 508 B.R. at 862 (awarding default interest only from maturity date, not petition date). Here, EGC has been paid the full amount of its principal, non-default interest and attorneys' fees through the chapter 11 process, and did not even have to wait for a chapter 11 plan to be confirmed in order to get paid.

The Debtors made all payments authorized by the Bankruptcy Court (*i.e.*, approximately $800,000) and agreed to by EGC.[26] In any event, it has been held

---

[25] Section 8.1(g) of the Loan Agreement makes it an event of default if any of the Debtors files for bankruptcy protection.

[26] Upon the filing of a bankruptcy: (1) the automatic stay comes into existence, which prevents creditors from taking most types of actions against a debtor and its property, and (2) a debtor is prevented from paying pre-petition obligations It is black letter bankruptcy law that a Chapter 11 debtor cannot make post-petition payments to a creditor on account of pre-petition obligations, absent the entry of a specific court order or a confirmed plan. *See e.g. In re Quality Interiors, Inc.*, 127 B.R. 391 (Bankr. N.D. Ohio 1991) ("The payment by

that where the default trigger is a missed postpetition payment in the circumstance where the lender is oversecured and protected by an equity cushion, as EGC was at all times during this case, it is not a cognizable default for purposes of awarding default interest. *Fischer Enterprises, Inc. v. Geremia* (*In re Kalian*), 178 B.R. 308, 315 (Bankr. D.R.I. 1995).

Thus, by virtue of the foregoing, the default alleged by EGC as triggering the imposition of default interest was technical in nature and does not support an award of default interest. Because the Bankruptcy Court's decision awarding default interest "cannot be located within the range of permissible decisions," it must be reversed.

*[remainder of page intentionally left blank]*

---

a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code, and such transfers are recoverable. 11 U.S.C. § 549"); *In re NextWave Personal Comm. Inc.*, 244 B.R. 253, 275 (Bankr. S.D.N.Y. 2000) ("Any notion of a legally cognizable 'default' presupposes that the debtors could have lawfully made post-petition payments to the FCC in the first instance. As a matter of fundamental bankruptcy law, the debtors could not have made post-petition payments on account of this prepetition claim….").

## **CONCLUSION**

By virtue of the foregoing, and consistent with *O'Brien*, the Bankruptcy Court's Default Interest Order should be reversed or modified to provide for a denial of any and all postpetition default interest to EGC unless and until unsecured creditors are paid in full.


Dated:  Bridgeport, Connecticut
         October 16, 2020

Respectfully submitted,

By: /s/*Irve J. Goldman*
     Irve J. Goldman (ct02404)
     **Pullman & Comley, LLC**
     850 Main Street, P.O. Box 7006
     Bridgeport, CT  06601-7006
     Telephone (203) 330-2000
     Facsimile  (203) 576-8888
     E-Mail:  igoldman@pullcom.com

     -and-

     Wojciech F. Jung, Esq.
     **LOWENSTEIN SANDLER LLP**
     1251 Avenue of the Americas
     New York, NY 10020
     Telephone: (212) 262-6700
     Facsimile: (973) 597-2465
     E-mail: wjung@lowenstein.com

     *Counsel to Appellant/The Official*
     *Committee of Unsecured Creditors of*
     *Latex Foam International, LLC et al.,*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 8015(a)(7)(C) of the Federal Rules of Bankruptcy Procedure, I hereby certify that:

1.      This brief complies with Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure, made applicable by Rule 8015(f), because it contains 8,610 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted from that count.

2.      This brief complies with the typeface requirements of Rule 8015(a)(5) of the Federal Rules of Bankruptcy Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated: October 16, 2020

/s/ *Irve J. Goldman*
Irve J. Goldman (ct02404)

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2020, a copy of Appellant's Brief was served by ECF, as well as by regular mail, postage prepaid upon the following:

Joseph Lubertazzi, Jr.
McCarter & English LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

*Attorney for Appellee*

/s/ *Irve J. Goldman*
Irve J. Goldman (ct02404)