## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| LATEX FOAM INTERNATIONAL, LLC, | : | Lead Case No. 19-51064 (JAM) |
| *et al.*, | : |  |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| OFFICIAL COMMITTEE OF | : | Case No. 3:20-cv-01200 (VLB) |
| UNSECURED CREDITORS OF | : |  |
| LATEX FOAM INTERNATIONAL, LLC, | : |  |
| *et al.*, | : |  |
|  | : |  |
| Plaintiff-Appellant, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ENTREPRENEUR GROWTH | : |  |
| CAPITAL, LLC, | : |  |
|  | : |  |
| Defendant-Appellee. | : |  |

## APPELLEE ENTREPRENEUR GROWTH CAPITAL, LLC'S BRIEF IN OPPOSITION TO APPEAL OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FROM BANKRUPTCY COURT ORDER <u>AWARDING INTEREST AT THE DEFAULT RATE</u>

Joseph J. Cherico (ct 24869)
McCarter & English, LLP
One Canterbury Green
201 Broad Street
Stamford, CT 06901
Tel.: (203) 399-5900
Email:  jcherico@mccarter.com

Joseph Lubertazzi, Jr. (*pro hac vice*)
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel.:  (973) 639-2082
Email: jlubertazzi@mccarter.com

ME1 35001412v.1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellee Entrepreneur Growth Capital, LLC hereby certifies that it has no corporate parent or publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.......................................................................ii

STATEMENT OF THE ISSUES
AND STANDARD OF APPELLATE REVIEW.......................................1

STATEMENT OF THE CASE ................................................................3

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT..........................................................................................16

I.   THE BANKRUPTCY COURT CORRECTLY APPLIED THE LAW
     AND DID NOT ABUSE ITS DISCRETION IN FINDING THAT EGC
     IS ENTITLED TO RECOVER POST-PETITION INTEREST AT THE
     DEFAULT RATE OF 3%.............................................................16

     A.   As An Over-Secured Creditor, EGC Has An
          Unqualified Legal Right To Recover Post-Petition Interest ..............16

     B.   The Bankruptcy Court Did Not Abuse Its Discretion
          In Considering The Relevant Equitable Factors And
          Awarding EGC Default Interest At The Rate Of 3%.........................18

     C.   The Debtors Defaulted Under The Loan Documents ........................35

CONCLUSION ...................................................................................39

# TABLE OF AUTHORITIES

## Cases

**Page**

*785 Partners LLC*,
   470 B.R. 126 (Bankr. S.D.N.Y. 2012) ...................................................18, 20, 21

*In re: Bownetree, LLC*,
   2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009)........................................37

*In re: Connaught Props., Inc.*,
   176 B.R. 678 (Bankr. D. Conn. 1995).................................................................19

*Fischer Enterprises, Inc. v. Geremia (In re: Kalian)*,
   178 B.R. 308 (Bankr. D.R.I. 1995) ....................................................................38

*In re: Florida Precast Concrete, Inc.*,
   144 B.R. 928 (Bankr. M.D. Fla. 1992)...............................................................29

*In re: General Growth Properties, Inc.*,
   2011 WL 2974305 (Bankr. S.D.N.Y. July 20, 2011)...................................38, 39

*In re: Holmes*,
   330 B.R. 317 (Bankr. M.D. Ga. 2005) ...............................................................28

*Key Nat'l Bank Ass'n v. Milham*,
   141 F.3d 420 (2d Cir. 1998) .........................................................................18, 21

*Labbadia v. Martin (In re: Martin)*,
   2020 WL 5300932 (D. Conn. Sept. 4, 2020).......................................................2

*In re: L&N Twins Place LLC*,
   2019 WL 5258096 (Bankr. S.D.N.Y. Oct. 15, 2019).........................................21

*In re: Madison 92nd Street Associates LLC*,
   472 B.R. 189 (Bankr. S.D.N.Y. 2012) .........................................................28, 30

ME1 35001412v.1

# TABLE OF AUTHORITIES
## (continued)

### Cases

**Page**

*In re: Marfin Ready Mix Corp.*,
   220 B.R. 148 (Bankr. E.D.N.Y. 1998) ...............................................................28

*In re: Myrtle Avenue Group, LLC*,
   598 B.R. 729 (Bankr. S.D.N.Y. 2019) .........................................................19, 20

*In re: Northwestern Airlines Corp.*,
   2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007)....................................37, 38

*O'Brien v. Presidents Holdings*,
   2014 WL 12931380 (D. Conn. Feb. 10, 2014)...........................................*passim*

*In re: P.G. Realty Co.*,
   220 B.R. 773 (Bankr. E.D.N.Y. 1998) ...............................................................19

*In re: Residential Capital, LLC*,
   508 B.R. 851 (S.D.N.Y. 2014) .......................................................28, 29, 30, 31

*Ruskin v. Griffiths*,
   269 F.2d 827 (2d Cir. 1959) ...............................................................................20

*In re: Terry Ltd. P'ship*, 27 F.3d 241 (7th Cir. 1994), *cert. denied sub nom.*,
   *Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa*,
   513 U.S. 948 (1994) .......................................................................................18-19

*Urban Communicators PCS Limited P'ship v. Gabriel Capital, LP*,
   394 B.R. 325 (S.D.N.Y. 2008) .......................................................18, 19, 21, 25

*U.S. v. Ron Pair Enters., Inc.*,
   489 U.S. 235 (1989) ...........................................................................16, 17, 18

*In re: Wolverine, Proctor & Schwartz, LLC*,
   449 B.R. 1 (Bankr. D. Mass. 2011)...................................................................28

iii

## TABLE OF AUTHORITIES
### (continued)

### Statutes and Rules

**Page**

Bankruptcy Code § 502(a) ............................................................................6

Bankruptcy Code § 506(b) ...................................................................*passim*

Bankruptcy Code § 1107(a) .........................................................................3

Bankruptcy Code § 1108 .............................................................................3

Federal Rule of Bankruptcy Procedure 3001(f) .........................................6

ME1 35001412v.1

Appellee Entrepreneur Growth Capital, LLC ("EGC"), a secured creditor of Latex Foam International, LLC and its affiliated entities who filed for bankruptcy on August 8, 2019 (collectively, the "Debtors"), respectfully submits this Brief in opposition to the appeal, filed on August 18, 2020 (the "Appeal"), by the Official Committee of Unsecured Creditors of Latex Foam International, LLC, *et al.* (the "Committee"), with respect to the Bankruptcy Court's Order Granting Entrepreneur Growth Capital, LLC's Motion for Payment of Secured Creditor Claim and Fee Application, dated and entered July 31, 2020 (ECF No. 670) (the "Default Interest Order").[1]  Specifically, EGC submits this Brief to respond to the arguments set forth by the Committee in Appellant's Brief in Support of Appeal from Bankruptcy Court Order Awarding Interest at the Default Rate, dated October 16, 2020 (D. Conn. ECF No. 18) (the "Appeal Brief" or "App. Br.").[2]

## STATEMENT OF THE ISSUES
## AND STANDARD OF APPELLATE REVIEW

The issue presented by the Committee on this Appeal is whether the Honorable Julie A. Manning, Chief Judge of the U.S. Bankruptcy Court for the District of Connecticut, committed reversible error in issuing the Default Interest Order.  Specifically, the Committee appeals that portion of the Default Interest

---

[1] References to "ECF No. ___" are to the assigned numbers for documents filed with the Bankruptcy Court in the Chapter 11 case of Latex Foam International, LLC, jointly administered with the other Debtors' cases under Case No. 19-51064 (JAM).

[2] References to "D. Conn. ECF No. ___" are to the assigned numbers for documents filed with the District Court in connection with the Appeal.

Order by which the Bankruptcy Court awarded default interest to EGC pursuant to Section 506(b) of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").[3]  According to the Committee, the Bankruptcy Court erred in issuing the Default Interest Order because:  (a) the Debtors are not in default under the loan documents that govern their relationship with EGC; (b) the Debtors' estates were and are insolvent such that other creditors are unlikely to see any recovery; and (c) the Debtors' bankruptcy cases have been run for and provided the primary benefit to EGC at the expense of all other parties in interest.  App. Br. at 2.

As detailed by the Committee in its Appeal Brief, "[w]hen reviewing bankruptcy appeals, the district court reviews conclusions of law *de novo* and applies the clearly erroneous standard to findings of fact."  *Id.* (quoting *Labbadia v. Martin (In re: Martin)*, 2020 WL 5300932, at *1 (D. Conn. Sept. 4, 2020)).  Equitable matters within the Bankruptcy Court's discretion should only be reversed if the Bankruptcy Court abused its discretion.  App. Br. at 3 (citing cases).

---

[3] Pursuant to the Default Interest Order, the Bankruptcy Court also awarded EGC its attorneys' fees and expenses.  The Committee is not appealing that portion of the Default Interest Order. App. Br. at 1.

ME1 35001412v.1

## <u>STATEMENT OF THE CASE</u>

On August 8, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  *See* Petition and Ex-Parte Application of the Debtors for Order Directing Joint Administration (ECF Nos. 1 & 2).  Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Debtors continued to manage their properties as debtors-in-possession throughout these proceedings until the sale of their assets.

EGC is a secured creditor holding a blanket lien on all assets of the Debtors, as detailed in the proofs of claim timely filed by EGC on October 17, 2019 in each of the Debtors' bankruptcy cases.  *See* Proofs of Claim (ECF Nos. 260-264).   Specifically, EGC is the holder of a Term Note, dated as of December 23, 2015 and executed by the Debtors, in the original principal amount of $13,159,371.42 (the "Note") (ECF No. 260 at 9-10 of 141).  EGC is also the holder of a Second Amended and Restated Loan and Security Agreement (the "Security Agreement"), executed by the Debtors and SummitBridge National Investments IV, LLC ("SummitBridge") (ECF No. 260 at 12-87 of 141). The Note, the Security Agreement and all other documents executed in connection therewith (collectively, the "Loan Documents") were assigned by SummitBridge to EGC by

3

a Loan Sale Agreement, dated as of March 10, 2017, and an Allonge to the Note, effective as of March 15, 2017 (ECF No. 260 at 130 of 141).[4]

Under the Loan Documents, the Debtors were required to make monthly installment payments to EGC, on the first day of each month through the "Maturity Date," in the amount of accrued but unpaid interest or $112,500, whichever was greater.  Security Agreement at 13, § 2.5.1(b) (ECF No. 260 at 28 of 141).  The "Maturity Date" was April 1, 2020.  Security Agreement at 8 (ECF No. 260 at 23 of 141).  Under the Loan Documents, the Debtors were required to pay EGC the outstanding principal balance plus all accrued but unpaid interest on the Maturity Date.  Security Agreement at 13, § 2.5.1(c) (ECF No. 260 at 28 of 141).

Under the Loan Documents, the Debtors agreed to pay interest in respect of the unpaid principal amount at a rate per annum equal to the greater of 5% or the "Prime Rate, plus the Applicable Margin" (as those terms are defined in the Security Agreement) (the "Interest Rate").  Security Agreement at 12, § 2.3 (ECF No. 260 at 27 of 141).  In addition, the Debtors agreed to a "Default Rate" of interest in the amount of the Interest Rate plus 3%.  Security Agreement at 4 (ECF No. 260 at 19 of 141).

---

[4] Copies of the Note, the Security Agreement and the Allonge are attached as Exhibits A, B and F to the Proof of Claim (No. 22-1) filed by EGC in Case No. 19-51064 (ECF No. 260).

ME1 35001412v.1

Under the Loan Documents, an "Event of Default" occurs when, among other things, the Debtors fail to make payments due under the Loan Documents or the Debtors file for bankruptcy or take other actions demonstrating their inability to repay their debts.  Security Agreement at 33-35, § 8.1(a) & (g) (ECF No. 260 at 48-50 of 141).  Under the Loan Documents, when an Event of Default occurs, the principal amount may, at EGC's option, bear interest at the Default Rate.  Security Agreement at 16, § 2.7 (ECF No. 260 at 31 of 141).

Under the Loan Documents, the Debtors also agreed to indemnify EGC for, among other things, all "costs and expenses (including, without limitation, attorneys' and paralegals' fees, costs and expenses, and fees, costs and expenses for investigations and experts)"  incurred by EGC "as a result of or arising from or relating to … [EGC's] preservation, administration and enforcement of its rights under the Loan Documents and applicable law, including reasonable fees and disbursements of counsel for [EGC] in connection therewith, whether suit be brought or not and whether incurred at trial or on appeal, and all costs of repossession, storage, disposition, protection and collection of Collateral…."  Security Agreement at 39, § 10.3 (ECF No. 260 at 54 of 141).

Repayment of the Note is secured by a lien on all "Collateral" – *i.e.*, "all property" of each of the Debtors, including, without limitation, the Debtors' accounts receivable, inventory, machinery and equipment.  Security Agreement at

5

3 & 37, § 9.1 (ECF No. 260 at 18 & 52 of 141).  The Debtors' obligation to indemnify EGC for its costs and expenses, including attorneys' fees, is likewise secured by the Collateral.  Security Agreement at 39, § 10.3 (ECF No. 260 at 54 of 141).

EGC perfected its security interest in the Collateral by recording various UCC Financing Statements as detailed in each proof of claim filed by EGC with respect to the Debtors (ECF Nos. 260-264).  No objections were filed in response to EGC's proofs of claim, which means those proofs of claim constitute *prima facie* evidence of the validity and amount of EGC's claim under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure and are deemed allowed under Section 502(a) of the Bankruptcy Code.

The Debtors bankruptcy filings came as a surprise to EGC.  8/27/19 Tr. (D. Conn. ECF No. 15) at 9:22-9:23.[5]  EGC was in the middle of negotiating a possible modification to the Loan Documents with the Debtors when the Debtors instead chose to file for bankruptcy.  8/27/19 Tr. (D. Conn. ECF No. 15) at 9:25-10:2.

---

[5] References to "[Date] Tr. at #:#-#:#" are to the page:line numbers of the transcripts of various hearings before the Bankruptcy Court that have been designated by the parties as part of the record on appeal.

ME1 35001412v.1

Upon filing for bankruptcy, the Debtors ceased making the monthly payments due to EGC under the Loan Documents.  Instead, on the Petition Date, the Debtors filed a series of "First Day Motions," including a Motion for Authority to Use Cash Collateral (ECF No. 4).  That Motion included a proposed budget that did not provide for any payments to EGC.  ECF No. 4, Ex. A.  On August 12, 2019, EGC filed an Objection to Certain of Debtors' First Day Motions (ECF No. 25).  Among other things, EGC objected to the Debtors' proposed use of cash collateral because the Debtors' budget did not provide for the payment of any amounts to EGC.  ECF No. 25 ¶¶ 6, 9-10.

On August 14, 2019, the Bankruptcy Court entered a Preliminary Order Authorizing Use of Cash Collateral and Providing Adequate Protection (ECF No. 48).  Pursuant to that Preliminary Order, the Bankruptcy Court allowed the Debtors to use cash collateral for 14 days in accordance with their proposed budget, subject to granting EGC a replacement lien on post-petition assets, but without any interim payments to be made to EGC.  Preliminary Order (ECF No. 48) ¶ 4.  No further payment was made to EGC until September 3, 2019, pursuant to the Court's Second Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection, dated August 27, 2019.  Second Interim Order (ECF No. 79) ¶ 5.

Some subsequent payments were made to EGC pursuant to further cash collateral orders entered by the Bankruptcy Court, albeit over EGC's objection in many instances. *See, e.g.,* ECF No. 216 (objecting to proposed fourth cash collateral order that included a 90-day proposed budget, rather than 30-day budget used with prior orders, particularly where there had been declines of $1.5 million in cash on hand, $300,000 in accounts receivable and $1.7 million in net working capital, plus significant proposed expenditures on unexplained professional fees and investment banker fees); ECF No. 396 (objecting to proposed sixth cash collateral order where Debtors were showing no urgency in pursuing a plan of reorganization and continued to propose payment of significant professional fees that diminished the overall value of the Debtors' estates); ECF No. 433 (objecting to proposed seventh cash collateral order where Debtors' assets continued to decline in value yet Debtors continued to propose payment of significant professional fees without any specifics regarding timing for suggested sale of Debtors' assets); ECF No. 488 (objecting to proposed eighth cash collateral order on similar grounds). Still other cash collateral orders were entered without providing for payments to EGC at all. *See, e.g.,* ECF No. 536 (ninth cash collateral order entered May 5, 2020); ECF No. 566 (tenth cash collateral order entered May 28, 2020); ECF No. 640 (eleventh cash collateral order entered June 25, 2020). *See also* App. Br. at 5 n.7 (acknowledging that payments were not

made to EGC for the months of January, March, May and June 2020); 7/15/20 Tr. (D. Conn. ECF No. 12) at 48:20-48:22 (stating it is "true" that EGC did not receive payments "during four of the 11 months of the case").

Meanwhile, in October 2019, the Debtors reported to the Bankruptcy Court that they intended to pursue a possible plan of reorganization and a sale process in parallel.  10/22/2019 Tr. (D. Conn. ECF No. 16) at 8:9-10:20.  The Committee stressed that establishing sale milestones was a "very important issue." 10/22/2019 Tr. (D. Conn. ECF No. 16) at 22:14-22:20.  Indeed, in its Objection to the Proposed Fifth Interim Order Authorizing Use of Cash Collateral, dated November 4, 2019 (ECF No. 265), the Committee asked the Bankruptcy Court to "impose meaningful milestones" in connection with a potential sale of the Debtors' assets.  ECF No. 265 ¶ 20.  As a result, the Fifth Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection, dated November 8, 2019 (ECF No. 272), imposed certain milestones on the Debtors in connection with any sale process being pursued by the Debtors.  ECF No. 272 ¶ 5(m).

Consistent with those milestones, on November 15, 2019, the Debtors filed an Application For Authority to Employ and Retain SSG Advisors, LLC as Investment Banker for the Debtors (ECF No. 288), by which the Debtors sought to employ SSG to advise and assist in pursuing a sale transaction.  In addition, on

November 29, 2019, the Debtors filed a Motion for Entry of an Order (A) Approving Sale Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, etc. (ECF No. 305), by which the Debtors asked the Bankruptcy Court to approve the Debtors' proposed bid procedures and authorize the Debtors to pursue the sale of their assets, with a proposed sale date of February 4, 2020. ECF No. 305 ¶¶ 21-23.

By Order entered December 18, 2019 (ECF No. 359), the Bankruptcy Court granted the Debtors' Application to Employ SSG.  However, after the Bankruptcy Court had months earlier expressed concerns regarding the timing for a sale as proposed by the Debtors, it was not until April 30, 2020 that the Debtors filed a new Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bidder Protections in Connection with the Sale of Substantially All of the Debtors' Assets … and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets, etc. (ECF No. 528), by which the Debtors asked the Bankruptcy Court to approve a revised set of bid procedures and to schedule a hearing to consider approving a sale.  On May 11, 2020, the Bankruptcy Court entered an Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets, etc. (ECF No. 550), by which the Court approved the bid procedures and scheduled a hearing on any proposed sale for June 12, 2020.

On June 5, 2020, the Debtors conducted an auction sale of substantially all of their assets.  On June 12, 2020, a hearing was commenced before the Bankruptcy Court in connection with the Debtors' motion to approve the sale.  6/12/20 Tr. (D. Conn. ECF No. 10).  The hearing was ultimately continued to June 16, 2020.  6/16/20 Tr. (D. Conn. ECF No. 11).  On June 16, 2020, the hearing before the Bankruptcy Court in connection with the Debtors' motion to approve the sale was concluded.  During that hearing, the Bankruptcy Court noted that, in recently granting the Debtors the use of cash collateral (*see* ECF No. 535), the Bankruptcy Court found that EGC is over-secured, taking into account the value of only the undisputed Collateral that is subject to EGC's lien – *i.e.*, the Debtors' cash, accounts receivable, inventory, machinery and equipment. 6/16/20 Tr. (D. Conn. ECF No. 11) at 34:8-34:21.  The Bankruptcy Court also noted that there is no evidence that the Debtors' estate is administratively insolvent.  6/16/20 Tr. (D. Conn. ECF No. 11) at 20:3-20:7.

On June 17, 2020, the Court issued an Order Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets to Artilat NV Free and Clear of Interests and (II) Related Relief (ECF No. 606) (the "Sale Order").  Pursuant to the Sale Order, at the closing on the sale of the Debtors' assets, EGC would receive payment of the following amounts:  (a) the outstanding principal amount of its claim, in the amount of $9,043,973.74; (b) interest at the

non-default contract Interest Rate of 5% through June 8, 2020, in the amount of $10,551.44; and (c) interest at the non-default contract Interest Rate of 5% from June 9, 2020, through the date of the closing on the sale transaction, at the per diem rate of $1,325.42.  Sale Order ¶ 27.

On June 22, 2020, pursuant to Section 506(b) of the Bankruptcy Code, EGC filed a Motion for Payment for Secured Creditor Claim and Fee Application (ECF No. 619) (the "EGC Motion for Default Interest"), by which EGC also sought payment of interest at the Default Rate of 3% plus attorneys' fees and other expenses, as permitted under the Loan Documents.  As noted in its supporting Declaration, as of June 15, 2020, accrued but unpaid interest at the Default Rate of 3% totaled $237,684.19.  ECF No. 619-1 ¶ 6 & Ex. 1.  Default Interest continued to accrue in the amount of an additional $753.67 per diem until the outstanding principal balance was paid in full.  ECF No. 619-1 ¶ 7.

On June 29, 2020, the Committee filed an Objection to the EGC Motion for Default Interest (ECF No. 648).  The Committee objected to EGC's request for default interest on the grounds that EGC purportedly failed to establish that the Debtors were in default under the Loan Documents and, in any event, according to the Committee, EGC should not be entitled to default interest unless and until unsecured creditors are paid in full.  ECF No. 648 ¶ 2.

12

On July 15, 2020, the Bankruptcy Court heard oral argument on the EGC Motion for Default Interest and the Committee's Objection.  7/15/20 Tr. (D. Conn. ECF No. 12).  On July 31, 2020, the Bankruptcy Court granted the EGC Motion for Default Interest and issued the Default Interest Order.  Pursuant to the Default Interest Order, the Bankruptcy Court awarded EGC interest at the Default Rate of 3% in the total amount of $237,684.19 as of June 15, 2020, with interest at the Default Rate of 3% continuing to accrue at the per diem rate of $753.67 from June 16, 2020 until the outstanding principal balance was paid in full as per the Sale Order.  Default Interest Order at 2.

EGC has since been paid all amounts due as per the Sale Order and the Default Interest Order entered by the Bankruptcy Court.  By way of this Appeal, the Committee asks the District Court to reverse the Bankruptcy Court and deny EGC any default interest "unless and until unsecured creditors are paid in full."  App. Br. at 33.

## SUMMARY OF THE ARGUMENT

The plain language of Section 506(b) of the Bankruptcy Code provides an over-secured creditor with an unqualified right to recover post-petition interest.  There is no dispute that EGC was over-secured by nearly $1,500,000.00 when the Sale Order was entered permitting the Debtors to sell their assets for $10,500,000.00.  There is also no dispute that Section 10.3 of the Security

13

Agreement that governs the relationship between EGC and the Debtors provides for interest at the Default Rate of 3%.  By law, that Default Rate is presumptively valid.

The Committee, however, asks this Court to ignore the mandatory nature of Section 506(b) and to instead impose a requirement that the unsecured creditors be paid in full before default interest is awarded to EGC.  It would be improper for the Court to rewrite the Bankruptcy Code in that way.

There are extremely limited circumstances in which the Court may exercise its discretion to award default interest at a rate less than what is provided for in the Loan Documents.  Specifically, to overcome the presumption of validity and potentially avoid application of the Default Rate, the Committee (as the objecting party) has the burden of proving that:  (i) EGC is guilty of misconduct; (ii) the application of the 3% Default Rate would harm the unsecured creditors or impair the Debtors' fresh start; or (iii) the contractual Default Rate constitutes a penalty.  The Committee, however, failed to meet its burden of proof before the Bankruptcy Court.

14

Indeed, the Committee does not contend and there is no evidence that EGC engaged in misconduct or that the Default Rate of 3% is unconscionable such that it constitutes a penalty.  Nor does the Committee contend that the Debtors' fresh start has been impaired.  To the contrary, all parties agree that the Debtors' estates have benefited from the sale process.

Rather, the Committee argues that allowing EGC to recover default interest at *any* rate would necessarily harm the unsecured creditors "unless and until unsecured creditors are paid in full."  App. Br. at 33.  In addition, the Committee half-heartedly contends that the Debtors never defaulted under the Loan Documents.

As detailed below, however, the Committee's arguments are not supported by the law or the facts.  Accordingly, the Bankruptcy Court did not err in its application of the law nor abuse its discretion in rejecting the Committee's equitable arguments based on the supposed harm to the unsecured creditors or the purported lack of default by the Debtors.  As a result, the Default Interest Order should be affirmed.

## ARGUMENT

**I.   THE BANKRUPTCY COURT CORRECTLY APPLIED THE LAW AND DID NOT ABUSE ITS DISCRETION IN FINDING THAT EGC IS ENTITLED TO RECOVER POST-PETITION INTEREST AT THE DEFAULT RATE OF 3%.**

### A.   As an Over-Secured Creditor, EGC Has An Unqualified Legal Right To Recover Post-Petition Interest.

Section 506(b) of the Bankruptcy Code provides:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there *shall* be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.  [Emphasis added.]

As the U.S. Supreme Court explained in *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989), the language of Section 506(b) is plain on its face and, thus, should be enforced according to its terms.  *Id.* at 241.  In other words, Section 506(b) allows an over-secured creditor an "*unqualified*" right to recover post-petition (*i.e.*, pendency) interest.  *Id.* (emphasis added).

Notwithstanding that holding by the U.S. Supreme Court, the Committee repeatedly but incorrectly states that EGC is not entitled to default interest "unless and until unsecured creditors are paid in full."  App. Br. at 17, 24, 28, 33.  According to the Committee, the Bankruptcy Court "misapplied" the law, because whether EGC should be awarded pendency interest under Section 506(b) is not controlled by the U.S. Supreme Court's decision in *Ron Pair.*  App. Br. at

17, 21.  However, in the next breath, the Committee moves on from talking about whether EGC "should be" awarded pendency interest to stating that *Ron Pair* does not control the "calculation" of pendency interest.  App. Br. at 21.  In other words, the Committee mixes the question of whether EGC is entitled to recover pendency interest with the question of what amount of interest is reasonable.

With respect to the former question, the U.S. Supreme Court's decision in *Ron Pair* is clear and must be followed – *i.e.*, the plain language of Section 506(b) provides that EGC shall recover post-petition interest.  Specifically, there is no dispute that EGC was over-secured when the Sale Order was entered. App. Br. at 5-6.  *See also* ECF No. 535 (finding that EGC is adequately protected and granting use of cash collateral by the Debtors); 7/15/20 Tr. (D. Conn. ECF No. 12) at 21:12-21:16 (Bankruptcy Court stating that EGC "was over secured"); *Id.* at 32:2-32:9 (same).  Indeed, the total amount of EGC's approved claim was $9,054,525.18 as of June 8, 2020 plus $1,325.42 per diem through closing as set forth in the Sale Order, while the approved sale price for the Debtors' assets was $10,500,000.00.  6/12/20 Tr. (D. Conn. ECF No. 10) at 21:3-21:8; Sale Order ¶ 27. Accordingly, there is no dispute that EGC has an unqualified right to recover post-petition interest under Section 506(b).

With respect to the latter question, as explained below, the Bankruptcy Court did not abuse its discretion in considering the relevant equitable factors and deciding to award EGC default interest at the contractual rate of 3%.

**B.    The Bankruptcy Court Did Not Abuse Its Discretion In Considering The Relevant Equitable Factors And <u>Awarding EGC Default Interest At The Rate of 3%.</u>**

While the rate of pre-petition interest allowed is based on the rate set forth in the governing loan documents, the rate of post-petition interest allowed is within the "limited discretion" of the Court. *Key Nat'l Bank Ass'n v. Milham*, 141 F.3d 420, 423 (2d Cir. 1998). Nonetheless, most courts award such interest at the contractual rate. *Id.* Indeed, the "great majority of courts to have considered the issue since *Ron Pair* have concluded that post-petition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose – the so-called 'contract rate' of interest." *Urban Communicators PCS Limited P'ship v. Gabriel Capital, LP*, 394 B.R. 325, 338 (S.D.N.Y. 2008).

Thus, there is a "rebuttable presumption that the over-secured creditor is entitled to default interest at the contract rate subject to adjustment based on equitable considerations." *O'Brien v. Presidents Holdings*, 2014 WL 12931380, at *3 (D. Conn. Feb. 10, 2014). *See also In re: 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) (same and citing *In re: Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994), *cert. denied sub nom.*, *Invex Holdings, N.V. v. Equitable Life Ins.*

*Co. of Iowa*, 513 U.S. 948 (1994)); *Urban Communicators*, 394 B.R. at 338 ("The courts adopt a presumption in favor of applying a contractual default interest, 'subject to equitable considerations'"). Stated another way, "[g]enerally, post-petition interest is allowed to over-secured creditors…at the contract rate, although some courts have reduced escalated post-default interest rates that would impose an *undue burden* on the holders of allowed unsecured claims." *In re: Connaught Props., Inc.*, 176 B.R. 678, 686 (Bankr. D. Conn. 1995) (emphasis added).

However, "[t]he power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *O'Brien*, 2014 WL 12931380, at *3; *In re: Myrtle Avenue Group, LLC*, 598 B.R. 729, 736 (Bankr. S.D.N.Y. 2019); *In re: 785 Partners LLC*, 470 B.R. at 134. *See also Urban Communicators*, 394 B.R. at 338 (the Court should be "loathe" to modify the contractually agreed upon default rate of interest "in the absence of compelling evidence" that recognition of that contractual right "would do violence to the principles which constitute the foundation of bankruptcy law") (quoting *In re: P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998)). The party objecting to the payment of interest bears the

burden of rebutting the presumption that the contract rate of interest applies post-petition. *In re: Myrtle*, 598 B.R. at 736; *In re: 785 Partners LLC*, 470 B.R. at 134.

"A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable." *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959). To the contrary, a contract that provides for a higher rate of interest upon default "can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan." *Id. See also O'Brien*, 2014 WL 12931380, at *4 ("The Second Circuit has recognized that an increased interest rate in the event of default does not constitute a penalty, and has noted that such provisions may be beneficial to debtors in that they permit them to secure financing at a lower rate of interest than they could otherwise obtain"); *In re: 785 Partners LLC*, 470 B.R. at 131 ("A higher default interest rate reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee").

As a result, courts routinely allow over-secured creditors to recover post-petition interest at the default rate set forth in the governing loan documents. *See, e.g., In re: L&N Twins Place LLC*, 2019 WL 5258096, at *7 (Bankr. S.D.N.Y. Oct. 15, 2019) (holding that creditor was entitled to post-petition interest at the 6% default rate set forth in the loan documents); *In re: 785 Partners LLC*, 470 B.R. at 131, 135-36 (holding that post-petition interest at 5% default rate on top of 5% base rate pursuant to the parties' contract was reasonable); *Urban Communicators*, 394 B.R. at 340 (reversing bankruptcy court order that placed a cap on default interest and finding that contractual default rate of 19%, compounded quarterly, resulting in 38% simple interest equivalent, was enforceable). "It is generally recognized that the interest allowed by § 506(b) will accrue until payment of the secured claim or until the effective date of the plan." *Milham*, 141 F.3d at 423.

Here, there is no dispute that the Loan Documents provide that EGC is entitled to Default Interest, which is just an additional 3% on top of the non-default contract Interest Rate of 5%. Security Agreement at 4 & at 16, § 2.7 (ECF No. 260 at 19 & 31 of 141). Under the case law cited above, this 3% Default Rate is presumptively valid. As the party objecting to the payment of interest at the Default Rate, the burden is on the Committee to prove the rare equitable circumstances exist that justify ignoring the agreed upon Default Rate – for example, that: (i) EGC is guilty of misconduct; (ii) the application of the 3%

Default Rate would harm the unsecured creditors or impair the Debtors' fresh start; or (iii) the contractual Default Rate constitutes a penalty.  In granting the Default Interest Order, the Bankruptcy Court necessarily and correctly found that none of those circumstances exist here.

Indeed, the Committee does not contend nor is there any evidence in the record that EGC engaged in misconduct such that EGC should be deprived of the right to seek default interest.  Likewise, the Committee does not contend and there is no basis for the Court to find that it is unconscionable to allow EGC to recover post-petition interest at the contractual Default Rate of 3%.  The Default Rate was agreed to by sophisticated commercial parties and does not constitute a penalty.  Further, the Committee does not contend nor is there any evidence that the Debtors are impaired by virtue of the payment of default interest to EGC.  To the contrary, the Debtors' estates have benefitted because, in addition to the $10.5 million purchase price, the buyer of the Debtors' assets is:  paying approximately another $600,000 in cure costs with respect to the Debtors' other third-party contracts; continuing to employee the Debtors' employees, while honoring their employment contracts and providing employee benefits; and assuming certain executory contracts.

Rather, this Appeal by the Committee is predominantly based on its contention that application of the 3% Default Rate would harm the unsecured creditors.  App. Br. at 22-30.  In particular, the Committee relies heavily on the Court's decision in *O'Brien* to argue that any award of post-petition interest must always be reduced to zero unless and until the unsecured creditors are paid in full. App. Br. at 23-24.  That, however, is not the holding of *O'Brien*.

In *O'Brien* (an unpublished decision), the Bankruptcy Court issued an order directing that certain real property owned by the debtor be sold at auction and permitting the secured creditor to credit bid an amount that included post-petition interest at the contract default rate of 24%.  *O'Brien*, 2014 WL 12931380, at *1.  The debtor appealed to the District Court, arguing that the Bankruptcy Court erred in concluding that the secured creditor was entitled to this post-petition default interest rate.  *Id.*  On appeal, the District Court *affirmed* the Bankruptcy Court's finding that the secured creditor was entitled to post-petition default interest, albeit ultimately reducing the award of post-petition interest based on the specific facts of that case – *i.e.*, "the insolvency of the estate, the *magnitude* of the default interest rate [*i.e.*, 24%], and the size of the *spread* between the non-default and default interest rates [*i.e.*, with a non-default rate of 6.25%, the spread was 17.75%]."  *Id.* at *5 (emphasis added).

23

The District Court in *O'Brien* did *not* rule that a secured creditor is not entitled to post-petition default interest unless and until the unsecured creditors are paid in full as argued by the Committee in this case.  To the contrary, in reducing the amount of default interest awarded, the District Court stated that it was reducing the award of post-petition interest based on the facts of that case to the highest amount that allowed the debtor to repay its unsecured creditors in full as a limitation on the *debtor*.

In particular, the District Court first acknowledged the general principles recited above – namely, although determining the appropriate default rate is within the "limited discretion" of the Bankruptcy Court, there is nevertheless a "rebuttable presumption" that an over-secured creditor is entitled to default interest at the contract rate, subject to adjustment based on equitable considerations, but with any adjustments to be made "sparingly" and in the "limited" situations where the Bankruptcy Court finds that the secured creditor engaged in misconduct, the contractual rate is a penalty, the debtor's fresh start will be impaired or the unsecured creditors will be unduly harmed.  *O'Brien*, 2014 WL 12931380, at *3.  With respect to assessing harm to the unsecured creditors, the District Court stated that, even assuming the debtor's estate is insolvent, it is still merely within the Bankruptcy Court's "*discretion*" (not mandatory) to award less than the contractual default rate in post-petition interest.  *Id.* at *4 (emphasis

added).  *See also id.* at *5 ("it is appropriate for a court to *consider* the effect of an award of default interest to a secured creditor on the claims of unsecured creditors") (emphasis added).

Next, the District Court in *O'Brien* discussed the *Urban Communicators* case decided in New York.  The District Court noted that it was found to be an error in that case to reduce the contractual default rate to compensate the debtor.  *O'Brien*, 2014 WL 12931380, at *5.  As the District Court explained, the Court in *Urban Communicators* "concluded that the Bankruptcy Court lacked discretion under the principles of equity to reduce the default rate such that the debtor received the additional funds in excess of the unsecured creditors' claims, and directed the bankruptcy court to *increase* the award of post-petition interest to the highest amount that would still permit the debtor to repay its secured creditors in full."  *Id.* (citing *Urban Communicators*, 394 B.R. at 340-42) (emphasis added).  Thus, according to the District Court in *O'Brien*, "although the Court has the discretion to reduce the post-petition default rate, it should *only* do so to the extent that would allow the unsecured creditors to be paid in full."  *O'Brien*, 2014 WL 12931380, at *4 (emphasis added).

In other words, the point made in *O'Brien* is this: even if in exercising its discretion the Bankruptcy Court determines that the limited equitable circumstances exist warranting a reduction in the contractual default rate of interest awarded to the secured creditor, the Court may *only* grant a reduction *up to* the highest amount that would allow for the unsecured creditors to be paid in full. There is no mandate that the Bankruptcy Court *must* reduce the contractual default rate of interest awarded to the secured creditor to allow for the unsecured creditors to be paid any monies at all.

To read *O'Brien* that way as suggested by the Committee would be to rewrite Section 506(b) and impose conditions on the recovery of default interest that do not otherwise exist under the plain statutory language of the Bankruptcy Code. The Committee wants to take away the right of EGC under its Loan Documents and the Bankruptcy Code to receive *any* default interest. It would turn the Bankruptcy Code on its head for this Court to adopt a bright-line rule by which unsecured creditors are paid in full before secured creditors are entitled to receive default interest. Such a result would be completely antithetical to the fundamental concept of bankruptcy law that secured creditors have priority over unsecured creditors. Clearly, that is not what the District Court in *O'Brien* had in mind.

Turning back to the unique facts of *O'Brien*, the District Court noted that the sale price of the debtor's real property in that case was enough to pay the secured creditor with additional funds remaining.  *Id.*  It was in that distinct context that the District Court in *O'Brien* decided to award default interest "*to* the highest amount that allows [the debtor] to repay its unsecured creditors in full."  *Id.* at *5 (emphasis added).  *See also* 7/15/20 Tr. (D. Conn. ECF No. 12) at 21:22-22:8 (Bankruptcy Court noting that in *O'Brien*, District Court "didn't say that [the secured creditor] can't seek or there wasn't a contractual right for default interest" and that District Court only reduced the 24% contractual default rate "under the circumstances of that case").

In other words, the District Court in *O'Brien* was clearly troubled by the 24% default interest rate compared to the 6.25% non-default interest rate in that particular case.  The District Court in *O'Brien* must have concluded that the unsecured creditors in that case would be unduly harmed by allowing a 17.75% additional default interest claim.  Those are not the facts in this case.

The decision to award default interest at the agreed upon contractual rate is an exercise of discretion based upon the Bankruptcy Court's understanding of the entire bankruptcy case, which should generally not be disturbed on appeal.  The decision in *O'Brien* to override the parties' contract is an outlier based on the unique facts and perspective of the individual Judge in that case.

27

Indeed, there are numerous cases in which bankruptcy courts have awarded default interest to secured creditors even though the unsecured creditors were not being paid in full, including *In re: Residential Capital, LLC* ("*ResCap*"), 508 B.R. 851 (S.D.N.Y. 2014), discussed in more detail below. *See also In re: Madison 92nd Street Associates LLC*, 472 B.R. 189, 220 n.7 (Bankr. S.D.N.Y. 2012) (stating it is "not intended" that "a Court should adjust the 'contract rate' simply because the debtor is insolvent and the unsecured creditors will not be paid in full if at all. Most chapter 11 cases involve insolvent debtors, and such an exception would swallow up the rule that the oversecured creditor is presumptively entitled to the 'contract rate'"); *In re: Wolverine, Proctor & Schwartz, LLC*, 449 B.R. 1, 6-7 (Bankr. D. Mass. 2011) (holding that over-secured creditor was entitled to interest at contractual default rate, because "the 2% difference between the interest rate and the default interest rate is not substantial," even though allowing default interest "diminishes the funds available to distribute to priority and unsecured creditors"); *In re: Holmes*, 330 B.R. 317, 321 (Bankr. M.D. Ga. 2005) (stating "[w]hen a creditor is oversecured, the estate need not be solvent for the creditor to be entitled to postpetition interest" and granting post-petition interest at 18% default rate provided for in promissory notes); *In re: Marfin Ready Mix Corp.*, 220 B.R. 148, 163-64 (Bankr. E.D.N.Y. 1998) (explaining that debtor need not be solvent in order to award default interest to over-secured creditor under

Section 506(b) and allowing default interest even though unsecured creditors would only receive five percent of their claims); *In re: Florida Precast Concrete, Inc.*, 144 B.R. 928, 929 (Bankr. M.D. Fla. 1992) ("The Debtor contends that the limitation upon a secured creditor's entitlement to a default rate of interest is two-fold:  the creditor must be oversecured, and the Debtor must be solvent.  There is nothing in the language of § 506 or in the caselaw interpreting the Section which warrants this reading.  Such a limitation would leave oversecured creditors with the ability to obtain default interest on their claim only in cases where the Debtor is solvent.  Experience has shown that those cases are rare.").

The Committee's reliance on *ResCap* does not require a different result.  In *ResCap*, the Court *allowed* the secured creditor to recover default interest at the contract rate, with such interest beginning to accrue from the maturity date of the loan rather than two weeks earlier when the bankruptcy petition was filed.  *Id.* at 859.  According to the Committee, "the equitable factors involved here are much stronger than in *ResCap* for denial of default interest." App. Br. at 25.  *ResCap*, however, does not require the District Court to reverse the Bankruptcy Court here.

To the contrary, in *ResCap*, that Court also noted that courts have "limited discretion" that should be used "sparingly" to modify the parties' contractual interest rate.  *ResCap*, 508 B.R. at 853-54.  In addition, the Court noted

29

that while a debtor's solvency is an important factor for courts to consider in deciding whether to award a secured creditor post-petition interest at the contractual default rate, "no court has adopted a bright line rule that the contract default rate should be refused in all insolvent debtor cases." *Id.* at 857-58. "[T]he presumptive contract default rate should not necessarily be adjusted downward in insolvent debtor cases even though the unsecured creditors will not be paid in full." *Id.* at 858. The reason for this is that "[m]ost chapter 11 cases involve insolvent debtors, and such an exception would swallow up the rule that the oversecured creditor is presumptively entitled to the 'contract rate.'" *Id.* (quoting *In re: Madison 92nd Street*, 472 B.R. at 200 n.7)).

In other words, while the debtor's solvency is one factor to consider, it is "not the determinative factor." *ResCap*, 508 B.R. at 858. Indeed, "a bright-line rule" that leads to the courts "[r]efusing to enforce bargained-for default interest for oversecured creditors raises the risk that lenders will demand higher interest rates from all high risk borrowers to compensate for the potentially higher costs of collection and greater risk of loss once bankruptcy begins." *Id.*

Thus, looking at the facts of the case in *ResCap*, the Court noted that "[w]hile it is easy to conclude that every dollar paid to [the secured creditor] is one dollar less for unsecured creditors, what is more difficult to say is that this result today is inequitable." *Id.* at 859. "All creditors benefitted as a result of the

Debtors' ability to continue to operate as a going concern – a result that was only possible when the Debtors obtained sufficient financing to conduct their business." *Id.*  The Court then noted that allowing default interest at the contract rate would diminish the pool of distributable assets by roughly two-tenths of a percent and that reduction "is not – on its own – sufficient to overcome the rebuttable presumption in favor of the contractual default rate."  *Id.* at 859-60.

Here, the Bankruptcy Court did not abuse its discretion in awarding EGC post-petition interest at the contractual Default Rate of 3%.  The Committee simply did not satisfy its burden of proving sufficient harm to the unsecured creditors to cause the Bankruptcy Court to override the parties' agreement with respect to the amount of default interest.

First, as the Bankruptcy Court stated at the hearing on the sale of the Debtors' assets, no party presented any evidence demonstrating that the Debtors' estate is administratively insolvent.  6/16/20 Tr. (D. Conn. ECF No. 11) at 20:3-20:7, 36:11-36:12.  That did not change by the time of the hearing on EGC's Motion for Default Interest, when the Debtors themselves admitted there was "still uncertainty that the case is administratively insolvent" even after the sale of the Debtors' assets had closed.  7/15/20 Tr. (D. Conn. ECF No. 12) at 16:6-16:11.  *See also id.* at 16:24-17:10 (acknowledging that even after payment of EGC's claim, including default interest, there was roughly $1.25 million available to pay

administrative claims); *Id.* at 34:9-34:22 (Debtors stating they do not know if it is true that the case is going to be administratively insolvent).

Second, although any amounts paid to EGC could, in theory, impact the amount to be paid to the unsecured creditors, there is no evidence in the record that this would in fact be the case here.  To the contrary, payment of default interest to EGC would have a negligible impact on those creditors as a practical matter in this case.  Numerous other parties with priority over the unsecured creditors must also be paid.  That includes the investment banker fee of $300,000 and the break-up fee of $100,000 in connection with the sale of the Debtors' assets, plus the U.S. Trustee's fees, other professional fees and administrative and priority claims, of which the exact amounts are still unknown but, collectively, are expected to total several hundred thousand dollars.

In other words, regardless of the default interest paid to EGC, there will be little left from the sale proceeds to pay the unsecured creditors relative to the total amount of their unsecured claims.  Depriving EGC of its contractually agreed upon right to receive default interest in the amount of approximately $250,000 by the time the sale of the Debtors' assets closed would, at best, provide mere pennies to the unsecured creditors on their claims.  This is not a situation where reducing default interest paid to EGC will result in full, or even any, payment to the unsecured creditors.  *See* 7/15/20 Tr. (D. Conn. ECF No. 12) at

33:8-33:16 (Bankruptcy Court stating "[w]e're not even talking about repaying unsecured creditors in this estate" and that has been the parties' position "throughout this whole case"); *Id.* at 35:2-35:4 (Debtors acknowledging that it is possible "there won't be any money for unsecured creditors" regardless of whether EGC is awarded default interest).  As such, payment of default interest to EGC could not be said to impose an undue burden on or truly impair the unsecured creditors.

The Committee's arguments on appeal are no less speculative now than they were at the hearing before the Bankruptcy Court on EGC's Motion for Default Interest.  For example, the Committee claims, without citing any evidence in the record whatsoever, that denying EGC default interest "could" increase unsecured creditor recoveries from "zero to approximately *eight* percent!"  App. Br. at 27 (emphasis in original).

The Committee also makes the conclusory assertion that EGC engaged in "value destructive conduct in the case."  *Id.*  In support of this proposition, the Committee states that EGC objected "at practically every turn to the Debtors' use of cash collateral and exercis[ed] tight control over the Debtors' operating budgets." *Id.* at 26.  The Committee, however, fails to inform the Court of the basis for those objections by EGC – namely, EGC repeatedly expressed its concern that its cash collateral was being used to pay high-priced, sometimes

33

unexplained, professional fees without any real direction or urgency by the Debtors in pursuing a plan for reorganization.  *See, e.g.,* ECF Nos. 216, 396, 433 & 488. There is simply no evidence that EGC engaged in "destructive conduct" of any kind.  *See, e.g.,* 7/15/20 Tr. (D. Conn. ECF No. 12) at 27:5-27:8 (Bankruptcy Court stating that EGC "had the right to fight the process along the way" because Debtors "didn't get the right to use their cash collateral without their consent. That's what the bankruptcy code provides.").

Equally specious is the Committee's suggestion that these bankruptcy cases were "run for and provided the primary benefit to EGC at the expense of all other parties in interest."   App. Br. at 2.   Although the Committee made this statement in passing in both its Objection to EGC's Motion for Default Interest and in the opening of its Appeal Brief, there is no further discussion nor evidence to support that suggestion.  The truth of the matter is that:  EGC had no knowledge that these cases were going to be filed; EGC was clearly over-secured at the outset when these cases were filed; EGC's cash collateral was used by the Debtors to pay other professionals and expenses throughout these cases, thereby diminishing the value of EGC's collateral and increasing the risk of less than a full recovery; the Committee supported establishing milestones for a sale; and, ultimately, the Debtors' estates benefitted from that sale.  *See, e.g.,* 7/15/20 Tr. (D. Conn. ECF

No. 12) at 31:4-31:22 (Debtors acknowledging that they and perhaps other creditors "absolutely" benefitted).

In short, there is no basis for the District Court to find that the Bankruptcy Court abused its discretion in rejecting the Committee's equitable arguments.  To the contrary, the Bankruptcy Court properly exercised its discretion in finding that the equitable factors weigh in favor of awarding EGC default interest at the contractual rate of 3%.

### C.    **The Debtors Defaulted Under The Loan Documents.**

Although a threshold question, the Committee tellingly relegates to the back of its Appeal Brief its argument that "the Debtors were not in default" under the Loan Documents.  App. Br. at 31.  The Committee is wrong.

The Loan Documents expressly provide that an Event of Default occurs when the Debtors fail to make timely payment of any amounts due under the Loan Documents.  Security Agreement at 33, § 8.1(a) (ECF No. 260 at 48 of 141).  The Loan Documents also expressly provide that an Event of Default occurs when the Debtors file for bankruptcy or take other actions demonstrating their inability to repay their debts.  Security Agreement at 34, § 8.1(g) (ECF No. 260 at 49 of 141).  Those situations all occurred in this case.

Specifically, the Debtors filed for bankruptcy on the Petition Date. ECF Nos. 1 & 2.  Further, in doing so, the Debtors demonstrated their inability to repay their debts in full and proposed the use of cash collateral without providing for any payments to be made to EGC.  ECF No. 4, Ex. A.  In fact, the Debtors made no further monthly payments to EGC until EGC objected and the Debtors were subsequently required to do so by virtue of certain cash collateral orders entered by the Bankruptcy Court.  ECF Nos. 25, 48 & 79.  Even then not all cash collateral orders required payments to EGC and the Debtors did not make all monthly payments that would normally be due under the Loan Documents.  *See* ECF Nos. 536, 566 & 640.  *See also* App. Br. at 5 n.7; 7/15/20 Tr. (D. Conn. ECF No. 12) at 48:20-48:22.  Moreover, although the loan evidenced by the Loan Documents matured on April 1, 2020, the loan was not paid in full at that time. Security Agreement at 8 & 13, § 2.5.1(b) & (c) (ECF No. 260 at 23 & 28 of 141).

The Committee asks the Court to ignore the Debtors' monthly payment default because EGC did not send a default notice to the Debtors and the equivalent amount was sometimes paid by the Debtors to EGC pursuant to cash collateral orders.  App. Br. at 5 & n.7, 30-32.  There is no requirement in the Loan Documents, however, for EGC to issue a default notice for an Event of Default to occur.  *See, e.g.,* Security Agreement at 39, § 10.1 (ECF No. 260 at 54 of 141) (stating no failure to exercise nor delay in exercising any right shall operate as a

waiver).  Moreover, making some but not all monthly payments pursuant to cash collateral orders does not excuse the Debtors' payment default, particularly when the loan subsequently matured but was not paid in full.

The Committee's proposition that these are just "technical defaults" that do not trigger default interest is not supported by the cases cited by the Committee.  App. Br. at 31-32.  For example, in *In re: Bownetree, LLC*, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009), the Court did not rule that the filing of bankruptcy can never serve as a ground for default that triggers default interest.  To the contrary, in *Bownetree*, the Court held that it would be improper in that particular case because the loan proceeds had not been disbursed in full at the time the borrower filed for bankruptcy, rendering the loan documents an executory contract.  *Id.* at *3.  In addition, the Court in *Bownetree* held that application of the default rate would be inequitable in that particular case because the 25% default rate was more than double the 12% non-default rate.  *Id.* at *4.

By way of further example, *In re: Northwestern Airlines Corp.*, 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2007), does not address the question of whether default interest can be triggered by the filing of a bankruptcy petition. Rather, in that case, the creditor sought default interest based on its contention that the debtor was in default as a result of the debtor's failure to disclose damage to an engine on an aircraft that served as collateral.  *Id.* at *1, 5.  Under those

ME1 35001412v.1

circumstances, including the lack of any harm resulting from the non-disclosure, the Court held that default interest was not warranted.  *Id.* at *5.

In *Fischer Enterprises, Inc. v. Geremia (In re: Kalian)*, 178 B.R. 308 (Bankr. D.R.I. 1995), the Court denied a request for post-petition default interest at the rate of 36%, finding that particular rate was unreasonable and that the "generous" non-default rate of 18% was sufficient to compensate the secured creditor.  *Id.* at 316-17.

The facts of this case are more analogous to cases like *In re: General Growth Properties, Inc.*, 2011 WL 2974305 (Bankr. S.D.N.Y. July 20, 2011). There, the debtors argued that the lender was not entitled to default interest because the loan was never properly accelerated.  *Id.* at *3.  The Court, however, rejected that argument, noting that the loan documents contain a clause providing that "the voluntary commencement of a bankruptcy case by any of the Debtors constitutes an event of default."  *Id.*  The Court also noted that "[t]his case is a good example of the reasons for enforcing reasonable contractual provisions in loan agreements that automatically impose a default interest rate upon a bankruptcy filing."  *Id.*  Among other things, lenders "should not be encouraged to accelerate debt prepetition to as to be certain that the default interest rate would be applicable in the event of a bankruptcy filing."  *Id.*  Thus, based on the automatic

default upon the debtors' bankruptcy filing, the Court awarded the lender interest at the default rate. *Id.* at *4.

Accordingly, there is no merit to the Committee's argument that the Debtors' defaults in this case are insufficient to trigger default interest.

## <u>CONCLUSION</u>

Section 506(b) of the Bankruptcy Code provides that EGC, as an over-secured creditor, *shall* be entitled to default interest. The Committee's argument that unsecured creditors must be paid in full before EGC is awarded default interest is not the holding of *O'Brien* or any other case cited by the Committee. This Court should reject the Committee's invitation to rewrite the Bankruptcy Code to impose any such condition on EGC. This Court should also reject the Committee's contention that the Bankruptcy Court abused its discretion in concluding that equitable considerations do not justify overriding the agreed upon Default Rate of 3%.

For the foregoing reasons, EGC respectfully requests that the Court deny the Committee's Appeal and affirm the Bankruptcy Court's Default Interest Order.

ME1 35001412v.1

Dated:  November 16, 2020        McCARTER & ENGLISH, LLP


By:  */s/ Joseph J. Cherico*
      Joseph J. Cherico (ct 24869)

One Canterbury Green
201 Broad Street
Stamford, CT 06901
Tel.: (203) 399-5900
Fax: (203) 399-5800
Email:  jcherico@mccarter.com

-and-

Joseph Lubertazzi, Jr.,
(admitted to Bankruptcy Court *pro hac vice*)
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel.:   (973) 639-2082
Fax:    (973) 624-7070
Email:  jlubertazzi@mccarter.com

Attorneys for Entrepreneur Growth Capital, LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 8015(h) of the Federal Rules of Bankruptcy Procedure, I hereby certify that:

1.      This document complies with the type-volume limitation of Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure because, excluding the parts of the document exempted by Rule 8015(g) of the Federal Rules of Bankruptcy Procedure, this document contains 9,215 words, as determined by the word-count function of Microsoft Word 2010.

2.      This document complies with the typeface requirements of Rule 8015(a)(5) of the Federal Rules of Bankruptcy Procedure and the type-style requirements of Rule 8015(a)(6) of the Federal Rules of Bankruptcy Procedure because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Time New Roman font.

Dated:  November 16, 2020

*/s/ Joseph J. Cherico*
Joseph J. Cherico (ct 24869)
McCarter & English, LLP
One Canterbury Green
201 Broad Street
Stamford, CT 06901
Tel.:   (203) 399-5900
Fax:   (203) 399-5800
Email:  jcherico@mccarter.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 16, 2020, a copy of the foregoing Entrepreneur Growth Capital, LLC's Brief in Opposition to Appeal of Official Committee of Unsecured Creditors from Bankruptcy Court Order Awarding Interest at the Default Rate, dated November 16, 2020, was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Joseph J. Cherico*
Joseph J. Cherico (ct 24869)
McCarter & English, LLP
One Canterbury Green
201 Broad Street
Stamford, CT 06901
Tel.:  (203) 399-5900
Fax:  (203) 399-5800
Email: jcherico@mccarter.com